UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



RECEIVED
JAN 2 0 2009
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| STANLEY TOLIN and EDWARD WALTON, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> AMBAC FINANCIAL GROUP, INC., ROBERT J. GENADER and SEAN T. LEONARD, <br><br> Defendants. | No. 08 Civ. 11241 <br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Stanley Tolin and Edward Walton ("Plaintiffs"), by their undersigned counsel, bring the claims set forth herein individually and on behalf of all other persons who purchased or acquired Structured Repackaged Asset-Backed Trust Securities, Callable Class A Certificates, Series 2007-1, STRATS(SM) Trust for Ambac Financial Group, Inc. Securities, Series 2007-1 ("STRATS") from the date of issuance on June 29, 2007, through and including April 22, 2008 (the "Class Period"). The following allegations are based upon the investigation conducted by Plaintiffs' counsel, which included, among other things, a review of the public announcements made by Defendants, including filings by Ambac Financial Group, Inc. ("Ambac" or the "Company") with the United States Securities and Exchange Commission ("SEC"), press releases, analyst and media reports regarding Ambac, a review of the pleadings and other documents filed in other litigation involving Ambac and certain other publicly available information. Many of the facts supporting the allegations contained herein are known

only to Defendants or are exclusively within their custody and/or control. However, Plaintiffs believe that further substantial evidentiary support will exist for the allegations in the Complaint after a reasonable opportunity for discovery.

## NATURE AND OVERVIEW OF THE ACTION

1.  This is a securities class action brought on behalf of all purchasers of STRATS publicly traded securities during the Class Period, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As discussed in greater detail herein, the STRATS were artificially inflated throughout the Class Period as a result of violations of the federal securities laws arising out of Defendants' dissemination of false and misleading statements concerning Ambac's financial results and operations with intentional and/or reckless disregard of the true condition of Ambac.

2.  Asset-backed securitization is a financing technique in which financial assets are pooled and converted into instruments that may be offered and sold in the capital markets. In a basic securitization structure, an entity known as the "sponsor" originates or acquires a pool of financial assets, such as mortgage loans or corporate debt securities. It then sells the financial assets to an issuer who places the assets in a specially created investment vehicle, usually a trust with an independent trustee, that issues and sells securities "backed" or supported by those financial assets. Such securities are generally known as "asset-backed securities" ("ABS"). While the predominant purchasers of ABS securities are institutional investors, transactions that pool and securitize outstanding debt securities issued by third party companies are marketed to retail investors and are listed on a national securities exchange.

3.      Payment on the ABS securities depends primarily on the cash flows generated by the assets in the underlying pool.  In addition, the sponsor or other third parties may provide external credit enhancements to the ABS securities to assure timely payment to investors.  For example, third party insurance may be obtained to reimburse losses on the pool assets or the asset-backed securities themselves.

4.      Ambac provides such financial guarantees and financial services to clients in both the public and private sectors around the world.  Ambac's principal operating subsidiary, Ambac Assurance Corporation, is a guarantor of public finance and structured finance obligations.  Throughout the Class Period Ambac guaranteed billions of dollars of private asset-backed structured financial instruments supported by collateral including residential mortgages.  These instruments were primarily residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDOs") supported by large bundles of securitized RMBS, as opposed to the mortgages themselves.  In addition to directly insuring RMBS, Ambac also issued credit default swaps ("CDS") as a derivative guarantee of CDOs of RMBS.

5.      The ABS market rapidly developed into an important part of the U.S. capital markets, particularly in the fixed income financial markets.  The modern securitization market originated in the 1970s with the securitization of mortgage backed securities.  Since the mid-1980s, the techniques pioneered in the residentially backed mortgage securities, or "RBMS," market have been used to securitize other asset types.

6.      ABS securities and ABS issuers differ from corporate securities and operating companies.  In offering ABS securities, the sponsor or issuer generally has no business or management to describe.  Rather, ABS investors are generally interested in

the characteristics and quality of the underlying asset pool and the timing and certainty of receipt of cash flows from the underlying asset pool in valuing such securities.

7.     Consequently the SEC has recognized the unique nature of ABS products, and has provided a regulatory framework governing the same.   *See* Asset-Backed Securities, 70 Fed. Reg. 1506, 1509-11 (January 7, 2005) (codified at 17 C.F.R. pt. 210, *et seq.*).  In this regulatory framework, the SEC recognized the "practical difficulties" that an ABS issuer faces with respect to obtaining, using, and evaluating the financial information of an unrelated third party.  Thus, because underlying issuers are required by law to make periodic filings, the SEC allows ABS sponsors and/or issuers to refer to the filings of the underlying third party securities issuer in lieu of providing the required financial information regarding such third party in their filings.

8.     Plaintiffs and members of the Class purchased STRATS, which was an ABS security bearing a fixed interest rate of 6.70% backed by Ambac debt securities.  More specifically, as detailed herein, STRATS represent a beneficial interest in the STRATS(SM) Trust for Ambac Financial Group, Inc. Securities, Series 2007-1 (the "STRATS Trust") which holds Ambac February 2007 Directly-Issued Subordinated Capital Securities ("DISCS") bearing interest at 6.15% as its sole asset.  The STRATS Trust had no business operations or other assets, and therefore the Ambac DISCS are the sole means for payment of interest and repayment of principal under the STRATS.

9.     Pursuant to SEC regulations, in the Prospectus and Registration Statement for STRATS, the Issuer of the STRATS, Synthetic Fixed-Income Securities, Inc., a wholly-owned subsidiary of Wachovia Corporation ("Wachovia"), repeatedly referred to Ambac's public filings, and more specifically Ambac's public filings with respect to the

DISCS, and informed investors that they "should obtain and evaluate the same information concerning the Underlying Issuer [*i.e.*, Ambac] as they would obtain and evaluate if they were investing directly in the [DISCS] or in other debt securities issued by the Underlying Issuer."  The Prospectus further cautioned STRATS purchasers that they would "be exposed to the credit risk of the Underlying Issuer [Ambac]."

10.    The STRATS Prospectus further represented:

It is a condition to the issuance of the Class A Certificates that the Class A Certificates are rated by the agency named below at least as highly as the Underlying Securities.  As of the date of this Prospectus Supplement, the Underlying Securities are rated "A+" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

11.    Against this background, prior to, and throughout the Class Period, Ambac repeatedly assured investors, through public filings and direct statements by its executive officers, including the Individual Defendants, that it exercised rigorous and conservative underwriting standards to ensure that it only guaranteed and provided credit enhancements for the safest transactions, that it diligently monitored its insured portfolios, and that it was exposed to no material risk of loss.

12.    Throughout the Class Period, investors, analysts and the marketplace placed reasonable reliance upon: (i) Ambac's public statements regarding Ambac's representations that the Company's superior underwriting and its surveillance of Ambac's exposure to risks arising from RMBS and CDO guarantees would protect both the Company and its investors; (ii) Ambac's SEC filings; and (iii) Ambac's AAA credit rating.  In turn, the market for STRATS securities promptly digested such current information regarding Ambac from all publicly available sources and reflected this information in STRATS securities prices.  Moreover, due to Defendants' active role in

5

providing insurance, financial guarantees and other credit enhancements to ABS securities such as STRATS, Defendants reasonably knew throughout the Class Period that their public statements and Ambac's credit rating would be reflected in the market price for securities such as STRATS.

13.     For example, on July 25, 2007, just days after the filing of the STRATS Prospectus, Morgan Stanley issued a report that concluded that "[t]he company's in-depth discussion on the conference call about how it protects itself against CDO losses and the favorable outlook for new business seemed to go a long way toward alleviating investor concerns . . . ."  Similarly, the next day, a Deutsche Bank report emphasized that Ambac has a "*[r]igorous CDO underwriting process*" and that "*Ambac is not the market*." (Emphasis in original.)  The report further stated:

> If we assume that its underwriting was done properly, its credit performance should not reflect the average or fall even close to the average . . . .  *Given Ambac's strict underwriting standards, risk assessment skills, and small exposure relative to the overall market, we believe Ambac will not suffer from credit losses*.  (Emphasis added.)

14.     In reality, unbeknownst to the market, at the direction of its executive officers, Ambac had drastically lowered its underwriting standards to ensure that it could "wrap", or guarantee, billions of dollars of high risk securities.  As detailed below, Defendants knew, or were reckless in not knowing, that its publicly issued securities, and all derivative securities backed thereby, were drastically losing market value because of an increasing likelihood of default, and significant occurrences of default would leave Ambac exposed to tens of billions of dollars of losses and write-downs that its capital structure could not afford, jeopardizing its ability to repay its debt securities such as the DISCS which backed the STRATS securities.

15.     Ambac pursued this risky strategic shift to satisfy the mandate set by Chief Executive Offer ("CEO") Robert J. Genader ("Genader") in 2005, to focus on intense revenue growth and to achieve net income of $1 billion a year in the near future. Defendants misused Ambac's credit rating and historic reputation for careful and conservative risk control and assessment as a cover for pursuing revenue growth in the riskiest corners of the derivative securities business.  The depth and nature of Ambac's detour into these avenues were concealed from investors, who were consistently reassured that Ambac's prior conservatism remained in full force setting it apart – and above – market forces.  In reality and unbeknownst to investors, in order to continue to pursue risky mortgage-linked deals, Ambac abandoned its prior model of conservative underwriting and risk management, and faced the same declining market forces as other failing institutions.

16.     Prior to and during the Class Period, Ambac reported strong earnings. Unfortunately for investors, these earnings were false and were achieved only by improperly valuing Ambac's book of highly risky securities.  As a result, Ambac's $3.7 billion of earnings for 2002 through 2007 would be more than wiped out by the massive write-downs and increased reserves that Ambac would be forced to take beginning in October 2007, related to Ambac's RMBS and CDO exposures just months after the issuance of the STRATS securities.  These write-downs and reserves would not only cause Ambac's stock price to decline, but also would cause the virtual collapse of its debt securities such as DISCS and thereby cause the price of STRATS to collapse from an issuance price of $25.00 per Class A Certificate on July 16, 2007 to a low of $2.47 on November 18, 2008.

17.     On January 16, 2008 – just months after the issuance of the STRATS securities and after Defendants repeatedly assured investors that Ambac's RMBS-related exposures were of a superior quality and that the Company was not exposed to material credit losses – Ambac stunned the market investors by disclosing: (a) $5.4 billion in "mark-to-market" write-downs on its then $29 billion in exposure to CDOs supported by RMBS; (b) a staggering $1.1 billion of actual impairments on these exposures; (c) a near tripling of its loss reserves due to deterioration of its direct RMBS portfolio; (d) a 67% reduction in its dividend payouts (in order to preserve capital); and (e) its CEO's unexpected "resignation" from the Company.   In response to this announcement the trading price of STRATS securities collapsed from $20.35 per Class A Certificate on January 15, 2008 to $8.95 on January 18, 2008.   Ambac then became the first major monoline financial guarantor to ever lose its treasured investment grade credit rating a few days later when the Fitch rating agency downgraded Ambac from "AAA" to "AA".

18.     The full truth of Ambac's exposure to highly risky mortgages continued to be gradually revealed throughout the remainder of the Class Period.   On April 23, 2008, Ambac reported a net loss for its first quarter 2008 of $1.66 billion on continued CDO write-downs, as well as, a more than $1 billion increase to its loss reserves on second-lien RMBS exposures.   In explanation, Ambac finally disclosed that these portfolios included a wide range of loans whose characteristics were far riskier than had previously been disclosed to the market.   The trading price of STRATS securities once again immediately reflected the news, collapsing from $11.42 per Class A certificate on April 22, 2008 to just $8.47 by April 24, 2008 as Ambac disclosed its massive RMBS and CDO loss exposures.

## JURISDICTION AND VENUE

19.     This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and §78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

20.     This Court has subject-matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391.  Many of the acts and practices complained of herein occurred in substantial part in this District.  Ambac also maintains its headquarters in this District.

22.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

## THE PARTIES

23.     Plaintiffs Stanley Tolin and Edward Walton purchased units of STRATS during the Class Period as reflected in their certifications attached hereto.  As a result of Defendants' conduct detailed herein, Plaintiffs suffered damages in connection with their purchase of STRATS securities at artificially inflated prices during the Class Period.

24.     Defendant Ambac is a New York-based holding company whose subsidiaries provide financial guarantee products and financial services to both public and private sector clients.  Ambac Assurance Corporation is its primary operating subsidiary. Ambac was the issuer of securities in the Ambac February 2007 DISCS

Offering which were pooled and securitized by Wachovia through its wholly owned subsidiary Synthetic Fixed Income Securities, Inc.

25.     Genader was at all relevant times a director, President and CEO of Ambac until January 16, 2008, when he resigned from the Company.  Genader became Chairman of Ambac's board of directors in July 2006.  Genader additionally served as Chairman, President and CEO of Ambac Assurance at all relevant times until January 16, 2008.  Pursuant to powers-of-attorney, Defendant Sean T. Leonard signed the DISCS Registration Statement/Prospectus on behalf of Genader in Genader's capacity as Chairman, President, CEO and director of Ambac.

26.     Defendant Sean T. Leonard ("Leonard") is, and at all relevant times was, Senior Vice President and Chief Financial Officer ("CFO") of Ambac and Ambac Assurance.  Leonard signed or caused to be signed on his behalf the DISCS Registration Statement/Prospectus.

27.     Defendants Genader and Leonard are collectively referred to herein as the "Individual Defendants."  The Individual Defendants were not only required to keep themselves informed of Ambac's business and finances on a daily basis, they were also responsible for keeping Ambac non-management directors apprised of the Company's financial condition.  The Individual Defendants and Ambac are collectively referred to herein as "Defendants."

### CONTROL PERSON ALLEGATIONS/GROUP PLEADING

28.     At all relevant times during the Class Period, the Individual Defendants were controlling persons of Ambac within the meaning of Section 20(a) of the Exchange Act.  By reason of their stock ownership, management positions, and/or membership on

Ambac's Board, the Individual Defendants were controlling persons of Ambac and had the power and influence, and exercised the same, to cause it to engage in the illegal conduct complained of herein.

29.     By virtue of the Individual Defendants' positions within Ambac, they had access to undisclosed adverse information about its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants would ascertain such information through Ambac's internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, conversations and connections with vendors and customers, attendance at sales, management, and Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as Ambac officers and directors.

30.     It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in Ambac's public filings and press releases as alleged herein was the result of the collective actions of the Individual Defendants identified above.  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of Ambac at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

31.     The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding Ambac, and approved or ratified these statements, in violation of the federal securities laws.

32.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Ambac's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.  The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

33.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of Ambac, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be

corrected.  Accordingly, they are responsible for the accuracy of the public reports and releases detailed herein.

**CLASS ACTION ALLEGATIONS**

34.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class of all persons who purchased or otherwise acquired STRATS securities during the Class Period, and who were damaged thereby, excluding Defendants herein, members of the immediate families of the Individual Defendants, any parent, subsidiary, affiliate, officer, or director of Ambac, any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

35.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiffs at the present time and can only be ascertained from books and records maintained by U.S. Bank Trust National Association, the trustee of the STRATS Trust or Synthetic Fixed Income Securities, Inc., the sponsor of STRATS Trust, and/or their agent(s), Plaintiffs believe that there are hundreds of members of the Class located throughout the United States.  During the Class Period, STRATS issued over $34 million worth of STRATS securities in $25 denomination.   Throughout the Class Period, STRATS securities were actively and efficiently traded on the NYSE under the ticker symbol "GJW."

36.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class actions and securities litigation and intend to prosecute this action vigorously.

Plaintiffs are members of the Class and do not have interests antagonistic to, or in conflict with, the other members of the Class.

37.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class purchased STRATS securities at artificially inflated prices and have sustained damages arising out of the same wrongful course of conduct.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members.  Among the questions of law and fact common to the Class are:

a.     Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.     Whether Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

c.     Whether Defendants had knowledge of (or were reckless with respect to) the improper activities described herein;

d.     Whether the statements disseminated to the investing public, including investors in STRATS securities, during the Class Period omitted and/or misrepresented material facts about Ambac's true financial condition, business operations and future business prospects;

e.     Whether Defendants acted knowingly or recklessly in omitting to state and/or misrepresenting material facts;

f.      Whether the market price of STRATS securities during the Class Period was artificially inflated due to the non-disclosures and/or misrepresentations complained of herein; and

g.      Whether Plaintiffs and the other members of the Class have sustained damages and, if so, the appropriate measure thereof.

39.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy since, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members individually to seek redress for the wrongful conduct alleged.  Plaintiffs do not foresee any difficulty in the management of this litigation that would preclude its maintenance as a class action.

40.      The names and addresses of the record owners of the Class A Certificates of STRATS securities are available from U.S. Bank Trust National Association, the trustee of the STRATS Trust, and/or its transfer agent(s).  Notice can be provided to persons who purchased or otherwise acquired STRATS securities by a combination of published notice and first class mail, using techniques and forms of notice similar to those customarily used in other class actions arising under the federal securities laws.

## FACTUAL BACKGROUND

### Ambac's February 2007 DISCS Offering

41.      On February 6, 2007, Ambac filed with the SEC a post-effective amendment to an automatic shelf registration on Form S-3, dated February 16, 2006 ("Post-Effective Amendment No. 1"), in connection with the February 2007 Directly-

Issued Subordinated Capital Securities ("DISCS") Offering ("February 2007 DISCS Offering").

42.     On February 7, 2007, Ambac filed with the SEC a prospectus supplement whereby Ambac offered $400 million of DISCS, which are unsecured subordinated debt instruments (together with Post-Effective Amendment No. 1, hereinafter referred to as the "DISCS Registration Statement/Prospectus").  The DISCS were priced at 99.335% of their par face value, for a total price to the public of $397.34 million.  After underwriting commissions, Ambac realized approximately $393 million.  At the close of trading on July 25, 2008, the DISCS were priced at $26.35.

43.     The DISCS Registration Statement/Prospectus incorporated by reference certain documents which, as set forth hereafter, contained misrepresentations and/or omissions of material facts, including: Ambac's Form 10-Q for the quarter ended September 30, 2006 and Ambac's Form 8-Ks filed on October 25, 2006 and January 31, 2007.  The October 25, 2006 and January 31, 2007 Form 8-Ks incorporated as exhibits Ambac's press releases of the same dates announcing Ambac's net income for the quarters ended September 30, 2006 and December 31, 2006, respectively.  In addition, a "Recent Developments" section in the DISCS Registration Statement summarized certain fourth quarter and full year 2006 financial results regarding its structured finance business, which were also reported in Ambac's January 31, 2007 press release, including Ambac's net income.  As detailed below, each of these public filings incorporated into the DISCS Registration Statement/Prospectus were false and misleading.

44.     Wachovia Capital Markets, LLC, a wholly owned subsidiary of Wachovia Corporation ("Wachovia"), served as an underwriter for Ambac's February 2007 DISCS Offering.

**The July STRATS Offering**

45.     On July 16, 2007, Synthetic Fixed-Income Securities, Inc. ("Issuer"), a wholly-owned subsidiary of Wachovia as issuer, filed a Prospectus Supplement to a Prospectus dated June 28, 2007 ("STRATS Prospectus") whereby the Issuer offered for sale $34,287,300 STRATS(SM) Callable Class A Certificates, Series 2007-1, representing the entire beneficial interest in the STRATS(SM) Trust for Ambac Financial Group, Inc. Securities, Series 2007-1 (the "STRATS Trust").

46.     The Trust was funded solely with $37,500,000 6.15% DISCS (the "Underlying Security") issued by Ambac (the "Underlying Issuer") in the February 2007 DISCS Offering (the "Underlying Securities") which were purchased by Wachovia in the open market.

47.     The holders of the STRATS securities were entitled to bi-annual payments of interest at an annual rate of 6.70%.  The STRATS Prospectus, however, specifically provided that such "[i]nterest on the Certificates will not be payable if any payment with respect to the Underlying Securities is not received by the trustee by 12 noon (New York City time) on an Underlying Securities Scheduled Payment Date as a result of a deferral of interest on the Underlying Securities . . . ."  The payment of interest to STRATS securities holders would then only resume "once (i) distributions on the Underlying Securities have resumed and (ii) all amounts due and payable on the Underlying Securities have been received by the Trust.  Similarly, STRATS securities holders were

entitled to receive return of the principal for the STRATS ($25 per Class A Certificate), but only "to the extent the outstanding principal amount of the Underlying Securities is repaid by the Underlying Issuer . . . ."

48.     In accordance with SEC Regulations governing ABS securities, the STRATS Prospectus specifically stated:

> Certificateholders will be exposed to the credit risk of the Underlying Issuer.  Material information with respect to the Underlying Issuer is described in public filings prepared by the Underlying Issuer and referred to in this Prospectus Supplement.  In addition, this section does not contain any risk factors relating to the Underlying Issuer.

> It is strongly recommended that prospective investors in the Class A Certificates consider and evaluate publicly available financial and other information regarding the Underlying Issuer .  .  .  .  Potential Certificateholders should obtain and evaluate the same information concerning the Underlying Issuer as they would obtain and evaluate if they were investing directly in the Underlying Securities or in other debt securities issued by the Underlying Issuer.

49.     The STRATS Prospectus also provided that:

> It is a condition to the issuance of the Class A Certificates that the Class A Certificates are rated by the agency named below at least as highly as the Underlying Securities.  As of the date of this Prospectus Supplement, the Underlying Securities are rated "A+" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

**Background Regarding Ambac**

50.     Ambac was founded in 1971 and was the first financial guarantor to insure the principal and interest of municipal bonds.  Ambac became known as a "monoline" insurer because it provided one type of insurance – a guarantee to protect against credit risk, i.e., the risk of default.  Ambac built a reputation as one of the leading financial guarantee insurers in the world, known for its coveted "AAA" investment grade credit rating and solid record of insuring the highest quality municipal bonds.  Ambac was

recognized for assessing risk to a "remote-loss" underwriting standard, meaning that Ambac paid on such a small amount of defaults that it was able to assume that any exposure that passed its rigorous investigation and credit analysis was not going to default.   In fact, Ambac told investors in its 2006 Form 10-K that it only insured exposures that it determined, after its underwriting process was complete, "are of investment grade quality with a remote risk of loss."

51.   Ambac's success in the financial guarantee market was based on its financial strength and ability to cover all of its obligations should a default occur.  Ambac increased investor confidence by emphasizing the rigorous credit analysis it conducted for every exposure receiving Ambac's coveted insurance.

52.   Ambac's success was also directly tied to its credit rating from the main credit rating agencies.  In 1979, Ambac received its first AAA credit rating from Standard & Poor's ("S&P").  Moody's Corporation followed in 1987 (awarding its equivalent AAA rating), and Fitch Ratings awarded Ambac its AAA rating in 1994.

53.   Through the issuance of a financial guarantee insurance contract – known as a "wrap" in industry terminology – Ambac would enhance a bond's or ABS security's credit rating by providing its own top rating to the security.  The "wrapped" bonds and ABS securities are effectively converted to a AAA-rated investment, allowing an issuer to save money by lowering the interest rate it has to pay to investors.  In exchange, the issuer pays the guarantor a premium that is calculated as a portion of the "spread" between the amount of interest it would pay absent insurance and the lower amount it pays by virtue of the financial guarantee.

54.     Since Ambac effectively sold its AAA credit rating to enhance the credit rating of bonds and asset-backed securities, the Company's business model depended entirely on maintaining its AAA rating.  To this end, in its 2006 Form 10-K, Ambac stated that "triple-A financial strength ratings . . . are an essential part of Ambac Assurance's ability to provide credit enhancement and any reduction in these ratings could have a material adverse affect on Ambac Assurance's ability to compete in the financial guarantee business."

55.     The rating agencies assign ratings to bond insurers based on proprietary models that measure, among other characteristics, the capital adequacy of financial guarantors under stress scenarios.  In order to preserve its credit rating, Ambac was required to maintain capital levels at, or in excess of, each agency's required amount, i.e., a capital cushion.  This procedure is designed to ensure that each monoline insurer has adequate levels of capital to cover all potential liabilities.

56.     Both investors and ratings agencies placed tremendous importance on the ability of Ambac to maintain its history of "remote loss" insurance.  Ambac's total capital was only a fraction of its total amount of insured obligations, so any material increase in losses would jeopardize Ambac's capital cushion, and ultimately its AAA rating.  For example, according to Ambac's first quarter 2007 Operating Supplement, while Ambac's net financial guarantees in force were a total of $819 billion as of March 31, 2007, its qualified statutory capital was only $6.6 billion, and its total claims paying resources was only $13.24 billion.  This resulted in a capital ratio (based on qualified statutory capital) of 125:1, and a financial resources ratio (based on total claims paying resources) of 62:1. Since the failure of as little as 5% of Ambac's insured portfolio would be enough to wipe

out Ambac's excess capital, the quality of the Company's underwriting and monitoring of its risk exposures was highly material to investors.

57.     The importance to Ambac of preserving its credit rating and avoiding excessive risk at all costs created conflict with its efforts to increase its income. This tension became greater in recent years, as Ambac's safe and stable municipal bond insurance business became a diminishing source of growth.

58.     As a result of the events described herein, Ambac became the first major bond insurer to lose its AAA rating when Fitch downgraded Ambac to AA on January 18, 2008, two days after Ambac shocked the market by disclosing a $5.4 billion write-down on derivative exposure to CDOs backed in part by RMBS, including over $1 billion in impairment charges, and $143 million in loss reserves on direct RMBS exposures. Shortly thereafter, both S&P (on June 5, 2008) and Moody's (on June 19, 2008) downgraded Ambac's credit rating. Ambac is no longer a AAA-rated company and, as a result, its ability to continue operating has been placed in jeopardy.

**Mortgage Lenders Abandoned Their Underwriting Standards**

59.     During the early and mid-2000s, the housing market bubble inflated, due in part to declining mortgage interest rates, spurring a rapid increase in the residential mortgage industry. The resulting demand for homes amid these lower interest rates fueled a rise in home prices, which then fueled a building boom in new homes. Simultaneously, investment bankers aggressively sought additional mortgages to bundle and sell as ABS securities, such as RMBS and CDO securities.

60.     As the ABS market grew exponentially, mortgage lending standards plummeted. Lenders engaged in aggressive lending practices in order to generate the

maximum number of mortgages to fuel the demand. Many mortgage lenders cast aside responsible underwriting criteria and originated massive volumes of loans that were much more likely to default. Lenders were willing to make these riskier loans because mortgage purchasers in the secondary markets were seeking mortgages to bundle in ABS securities, relieving the lender of the balance sheet risk associated with holding a weak or poorly underwritten loan.

61.     These lower grade loans subjected to minimal underwriting standards were basic assets in the RMBS and CDOs that Ambac insured. By insuring instruments backed by underperforming loans, Ambac significantly increased its risk of incurring debilitating losses, a fact concealed from the market until the Company was forced to take billions of dollars in mark-to-market losses and loss reserves.

**Ambac's Role In The Growth Of The ABS Market**

62.     Ambac played a key role in the explosion of the RMBS and CDO markets, while generating substantial profits and propping up its earnings to maintain its AAA-rating and high stock price. Ambac provided direct insurance for RMBS and protection for CDOs through credit default swaps ("CDS"), which were, in effect, insurance contracts between the financing bank and the CDO that is linked to the performance of the ABS collateral already included in the CDO. Both the insurance and CDS protections meant that Ambac would provide interest and principal in case of default of the underlying assets.

63.     Ambac also insured growing amounts of second-lien RMBS. A home equity line of credit ("HELOC") is a second mortgage loan drawn against the equity in a home. Unlike a HELOC, in which the borrower can decide to borrow, pay down

principal and then borrow again up to the maximum amount of the loan, a closed-end second loan ("CES") is also drawn against the value of the home in excess of any first-lien loan, but the borrower draws the entire amount upon loan issuance and cannot re-borrow after paying down principal.

64.     Payment on second-lien loans, both HELOCs and CES is directly related to the borrower's ability to pay the underlying first mortgage.  Second-liens are the last to be repaid and as housing prices decrease, the losses incurred on second-liens are far more severe than on first-liens.  As a result, in a deteriorating market, the risk of defaults and delinquencies in HELOC and CES deals was significantly higher.  Consequently, Ambac's portfolios of RMBS composed of HELOCs and CES mortgages faced increasing likelihood of losses at a time of decreasing home sales, stagnant or declining home prices and downturns in the economy.

65.     With respect to CDOs, which were collateralized by bundles of RMBSs as opposed to the underlying mortgages themselves, Ambac did not enter into traditional insurance contracts but, instead, entered into credit default swaps.  Ambac generally issued its CDS to investors purchasing the debt of the CDO, usually an investment bank. Pursuant to the CDS, the investment banks paid Ambac a premium for its guarantee that the principle and interest payments due to the investment bank as a senior debt holder of the CDO would be paid.

66.     Notably, when Ambac wrote traditional insurance, it had to allocate approximately 3% of the amount insured to support its capital cushion for regulatory and rating agency purposes.  However, when Ambac wrote credit default swaps against CDOs, the amount of capital it had to allocate to the transaction was lower, even if the

size of the deals and premiums paid to Ambac were the same.  Writing credit default swaps, therefore, could be more profitable to Ambac than traditional insurance.

67.     Ambac's portfolio of guarantees issued for CDOs of RMBS increased exponentially in recent years.  Based on a CDO exposure chart that Ambac provided in the first quarter of 2008, the Company's net exposure to CDOs with greater than 25% RMBS as the underlying collateral increased from $900 million in 2004 to approximately $29 billion as of December 31, 2007.  In percentage terms, CDOs with over 25% RMBS collateral represented just 5.8% of its total domestic CDO exposure in 2004, and rose to 57.5% of the portfolio by the first quarter of 2008.

### DEFENDANTS' FRAUDULENT SCHEME

68.     Under the leadership of Genader, Ambac's focus turned to the generation of greater profits in lieu of risk management and loss avoidance.  In 2005, Genader made this focus known.  It has been alleged that at a companywide meeting in 2005, Genader announced that Ambac's goal would be to achieve $1 billion a year in net income in the near future.   Genader aggressively pushed all units of the Company to focus on increasing gross premium income, but resisted the increased staffing and other expense needed to ensure adequate underwriting and risk monitoring capabilities for complex insurance products.

69.     Genader quickly profited handsomely from his insistence that Ambac assume greater risk.  His compensation was linked closely to Ambac's reported returns on equity.   Including salary, bonus and stock and option awards, Genader earned $5,873,674 in 2005 and $11,235,531 in 2006.

70.     To achieve these income levels, Ambac became more reliant on revenues from structured finance, i.e., the direct and derivative guarantees of RMBS and CDOs tied to RMBS.  It was this focus on revenue, expansion and deriving more profits from RMBS and CDOs backed by RMBS that was eventually the cause of material increases in mark-to-market write-downs and loss reserves that erased over five years of Ambac's profits.

**Ambac Secretly Relaxed Its Underwriting Standards**

71.     Defendants were aware of the steep decline in the housing market by the beginning of the Class Period.   Nevertheless, they abandoned Ambac's historical underwriting standards in order to insure riskier and riskier RMBS-related instruments. Yet, Defendants consistently represented that Ambac's superior underwriting allowed it to select higher quality mortgage-linked collateral and that its monitoring of the performance of that collateral ensured that surprise losses would not happen.  These assurances were particularly important because the RMBS and CDOs insured by Ambac were opaque instruments, leaving investors with little or no insight into the actual performance of the underlying collateral.  For CDOs in particular, investors did not even know the identities of the CDOs that Ambac guaranteed, or the actual collateral supporting those CDOs, until near the end of the Class Period.  Instead, investors and market analysts were left to rely solely on the positive representations by Defendants.

72.     While Genader pushed all units of the Company to drive gross premium income, the Company did not want to increase the company's infrastructure to achieve that goal.   For example, it has been alleged that the surveillance department was understaffed and was generally in disarray by 2006, even though Ambac's own

disclosures report that adequate underwriting often "*entails on-site due diligence covering the parties to the transaction, such as the issuer, originator, servicer or manager*." *See, e.g.,* Ambac 2006 Form 10-K (Emphasis added.)

73.    As a result of this on-site due diligence, in 2005 and early 2006, Ambac learned that the underwriting standards of the mortgage originators who provided the mortgages to back the RMBSs Ambac was guaranteeing were being systematically lowered in order to maintain profits in the face of a slumping market.  Ambac continued to witness the deterioration of the underwriting standards at the mortgage originators throughout the Class Period.  Instead of requiring heightened protections and demanding solid underlying collateral for RMBS related deals it insured, Ambac lowered its own underwriting standards, while at the same time assuring the investing community that its RMBS-related portfolio was better than the market due to its stringent underwriting and surveillance policies.

74.    Ambac's historical underwriting standards would have prevented the RMBS sales team from guaranteeing many of the RMBS deals being offered to Ambac in 2006.  Ambac's prior commitment to investor and capital protection, however, conflicted with the push to generate short term revenues sufficient to reach Genader's goal of reporting $1 billion of net income.  Consequently, Defendants chose to ignore the deterioration of the originator's lending standards, changing Ambac's own underwriting standards so that the Company could insure more and more of these poor quality loans.

75.    The first shift towards accepting greater risk came through lowered demands for overcollateralization when HELOC deals were guaranteed.  For example, Ambac would only guarantee HELOC RMBS if the model predicted that the RMBS

would be overcollateralized by 3.5%, meaning that it had a 3.5% cash cushion above anticipated cash outflows, including defaults, within a twelve month time frame. This 3.5% of overcollaterization served as a credit enhancement or protection from loss, for Ambac, since there would be an additional 3.5% of collateral to offset any losses in the HELOC RMBS.

76.     Nevertheless, by early 2006 Ambac no longer required that a HELOC product include as much overcollaterization. By this time, as long as the model predicted that the RMBS would include overcollaterization of only 0.5%, Ambac would approve the deal. This reduction was highly material and substantially lowered the credit enhancement protection Ambac required in its HELOC deals, thereby significantly increased the Company's risk exposure to these deals.

77.     Similarly, during this same time period, Ambac began to insure RMBS backed by loans that were structurally riskier than it had in the past, particularly closed-end second lien products. Prior to 2006, the RMBS that Ambac insured were backed by mortgages from borrowers who had owned their homes for years, so they had a history of payment on their first liens and owned equity in their homes. After 2006, however, Ambac agreed to insure increasing amounts of RMBS backed by CES mortgages issued to home purchasers who applied for a second lien to cover the initial down payment on their homes, otherwise known as piggy-back loans. In other words, these home purchasers either did not have enough capital or were not willing to pay their own capital to meet the down-payment requirements of the first lien loans. Moreover, Ambac was aware that these CES loans were being originated under substandard underwriting standards.

78.     Moreover, in June 2006, Ambac affirmatively and secretly changed the risk profile of its RMBS portfolio by altering its underwriting model so it could approve deals that would not be approved under the prior model.  This new model created by Ambac's underwriting department and approved by members of the Credit Risk Committee was designed so that riskier, lower-quality RMBS would be approved.

79.     Ambac's historical underwriting model attempted to determine the future performance of a particular RMBS through a detailed review of the characteristics of each underlying HELOC loan contained within the mortgage pool providing cash flows to the RMBS.  Ambac would apply tested assumptions on a loan-by-loan basis to predict performance and assess risk.  The lower quality of mortgages being originated would be identified by this pool-specific approach.

80.     Ambac's post-June 2006 RMBS underwriting model, implemented by the start of the Class Period, however, did not look at any of the actual loans in the mortgage pool collateralizing the RMBS.  Instead, the new model looked only at the historical cumulative default rates of the loan originators to determine the future performance of the RMBS.

81.     This new model's reliance on historical rates of default by originator was highly problematic.  The historical default rates of loan originators could not predict the future performance of loans issued in and after mid-2006.  Consequently the new underwriting model resulted in Ambac approving high risk RMBS transactions, which would have been rejected under the prior model.  Ambac never disclosed to the public that it materially changed its underwriting methodology.

**Defendants Misrepresented Ambac's Surveillance Of Its RMBS And CDO Portfolios**

82.     Defendants also misrepresented Ambac's surveillance process during the Class Period.  Throughout the Class Period, Defendants repeatedly assured investors that Ambac was carefully monitoring the performance of its portfolio.  Such monitoring was critical to investors because sudden losses or collateral deterioration would undermine Ambac's capital cushion, as well as, its credibility.

83.     Ambac's surveillance group, however, relied heavily on the published ratings by the credit rating agencies in determining whether to actually review the RMBS collateral supporting Ambac's CDO exposures, rather than conduct actual surveillance. This heavy reliance on the ratings agencies was in direct contradiction to Ambac's assurances that it was actively monitoring the performance of its CDOs.

84.     In fact, if Ambac conducted the "active surveillance" it described to assess loan performance and detect collateral deterioration, then Defendants affirmatively knew the delinquency rates and default rates of the underlying loans in the residential mortgage instruments Ambac insured were increasing throughout the Class Period.   In a presentation to the Association of Independent Financial Advisors ("AIFA") conference, Ambac executive David Uhlein represented that Ambac executives received "monthly, quarterly reports on all the transactions that [Ambac] guarantee[s]."  A review of such reports would readily have alerted Defendants of the increase in delinquency rates and default rates of the underlying loans in the residential mortgage instruments Ambac insured.  Defendants, however, never disclosed to the investing public that Ambac's residential mortgage portfolio was experiencing increased defaults and delinquencies in line with the mortgage market at large.

85.     Had Ambac's prior representations been true, Ambac, in independently analyzing the performance of the underlying assets, would have known that (a) by the beginning of the Class Period, there was a negative trend indicating rising delinquencies and default rates in the underlying collateral in the RMBS-related instruments that Ambac insured that should have been disclosed to investors, together with its 2006 lowering of its underwriting standards; (b) the cost of the credit default swaps that Ambac issued for CDOs backed by RMBS were increasing in value, and Ambac's liabilities through these swaps should have been marked-to-market in significant amounts as early as February 2007; and (c) the RMBS-related instruments that Ambac insured were materially impaired much earlier than January 2008.

**The Housing Market Decline In Late 2006 Raised The Risk Of Losses In Ambac's RMBS-Related Exposures**

86.     By late 2006, the signs of a housing downturn were prevalent – housing sales were on the decline, interest rates increased, and default and delinquency rates were starting to spike.  As home price appreciation was materially declining, the quality of mortgage loans that were securitized was also steadily declining.  Starting in 2005 and extending into 2007, the quality of mortgage loans that were pooled together into RMBS-related deals deteriorated with each successive quarter.  As described above, Ambac was aware of this deterioration in mortgage originators' underwriting standards based on its quarterly review and due diligence of mortgage originators.

87.     In an S&P report for the third quarter of 2006, S&P noted that issuers claimed to be tightening their underwriting standards in response to rising delinquencies and early payment defaults.  Similarly, Moody's Investors Service ("Moody's") observed that there had not merely been a one-time shift in the quality of loans, but that there

appeared to be a trend of weakening loan quality.  In the first quarter of 2007, Moody's noted that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."  In June 2007, Moody's noted that "within the 2006 vintage . . . the performance of late-2006 pools is generally worse than that of early-2006 pools," and that "following the pattern of serious delinquencies . . . cumulative losses for late 2006 pools have trended higher than those for early 2006 pools at the same points of seasoning."

88.     These conditions created a substantial risk of increased losses in Ambac's RMBS-related exposures.  The erosion of the supposedly secure revenue streams that supported the highly rated tranches of RMBS and CDOs that Ambac guaranteed meant that the risk was increasing that Ambac would actually have to (a) pay out on these instruments and (b) disclose and account for these losses, impairing its capital cushion. Defendants understood that reporting a sudden increase in losses and capital impairments would create significant pressure on Ambac's AAA credit ratings.  Rather than disclose to investors that Ambac faced substantial losses as a consequence of this increased risk, Defendants continued to represent to investors that Ambac's guaranteed products were of superior quality and were not exposed to the declines in value affecting the housing market.

**Ambac's RMBS-Related Portfolios Did Not Outperform The Market**

89.     By early 2007, both the media and research analysts were reporting on the weakening housing market, and began to link the decline in housing prices, rise in interest rates and increase in defaults to a weakening of the securitized RMBS and CDO

markets.   Investors became concerned that significant declines in two market-based indices known as the ABX and TABX indicated deterioration in the values of RMBS and CDOs backed by RMBS collateral.  The ABX consists of market indices that track the value of credit default swaps written as insurance against dozens of representative RMBS, much like the S&P 500 index is a proxy for the performance of large publicly-traded corporations.  The TABX tracks the price of CDS based on the BBB and BBB-tranches of the ABX indices, except that it tracks valuation based on year of origination and level of subordination.

90.     Rather than report collateral deterioration and mark-to-market write-down's in line with the deteriorating market, which would disclose to investors that Ambac's RMBS-related exposures were under stress and that losses were a reasonable expectation, Defendants bolstered Ambac's stock price by insisting that market deterioration was not an indication of deterioration of Ambac's exposures.   In fact, Ambac was witnessing the same deteriorating mortgage performance in its portfolios as the rest of the market.

91.     Notably, Ambac did not identify the underlying collateral of its insured CDOs.  Thus, the investment community was forced to accept Defendants representations until January 30, 2008, when a third party posted on its website an "Open Source Model," which listed all of Ambac's RMBS and CDO exposures, including the securities comprising the collateral for Ambac's CDOs.

92.     Upon disclosure of this information, studies have concluded the performance of the RMBS insured by Ambac through its CDOs did not perform better than the market, but instead performed similarly, and often times worse, than the market.

93.     Notably, Ambac's HELOC and CES exposures performed almost identically (i.e., just as poorly) as the ABX and TABX indices.  Investors should have been, but were not, informed that Ambac's HELOC and CES exposures were showing markedly deteriorating performance – just like the deterioration making headlines in the marketplace.  This fact was confirmed by Ambac's second quarter 2008 earnings release which revealed for the first time that through mid-2006, the average percentage of underlying mortgages that were in delinquency by 30-59 days was under 1%, but that this figure had doubled by the end of 2006, tripled by the late summer of 2007, and quadrupled by the end of the year.  Ambac should have disclosed this negative trend to investors.

**Defendants Knowingly Or Recklessly Concealed Billions Of Dollars In Mark-To-Market Write-Downs From Investors**

94.     Ambac was required to account for the value of its credit default swap exposures to CDOs in accordance with the Statement of Financial Accounting Standards 133, entitled "Accounting for Derivative Instruments and Certain Hedging Activities" ("SFAS 133").  Throughout the Class Period, Ambac failed to comply with SFAS 133 by ignoring the governing relationship between fair value and pertinent market data.

95.     Based upon information now available, studies have demonstrated that as of March 30, 2007, Ambac had exposure to approximately $20 billion of CDS on CDOs of ABS.  As of this period, the 40-100 TABX index had declined to approximately 84% of par.  Thus, by March 30, 2007, Ambac was required by Generally Accepted Accounting Principles (or "GAAP") and SFAS 133 in particular, to write-down at least $2.068 billion relating to its CDS on CDOs of ABS from 2006-2007.  For that same quarter, Ambac, in violation of GAAP and SFAS 133, wrote down a total of only $5.124

million.  Had Ambac's financial statements for the quarter accurately reported this mark-to-market write-down, Ambac's reported net earnings would have declined from a reported profit of $213 million to a loss of $1,311 million, and its earnings per diluted share would have declined from a reported profit of $2.04 per share to a loss of $12.53 per share.

96.     Similarly, as of June 30, 2007, Ambac had exposure to approximately $24.3 billion of CDS on CDOs of ABS.  As of this period, the 40-100 TABX had declined to approximately 69% of par.  Thus, by June 30, 2007, Ambac was required by GAAP and SFAS 133 to write-down at least an additional $2.716 billion relating to its CDS on CDO of ABS from 2006-2007.  For that same quarter, Ambac, in violation of GAAP and SFAS 133, wrote down a total of $56.87 million.  Had Ambac's financial statements for the quarter accurately reported this mark-to-market write-down, Ambac's reported net earnings would have declined from a reported profit of $173 million to a loss of $1,810 million, and its earnings per diluted share would have declined from a reported profit of $1.69 per share to a loss of $17.65 per share.

97.     As of the end of the third quarter 2007, ending September 30, 2007, Ambac had exposure to $26.2 billion of CDS on CDO of ABS.  As of this period, the 40-100 TABX had declined to approximately 33% of par.  Thus, by September 30, 2007, Ambac was required by GAAP and SFAS 133 to write-down at least an additional $8.923 billion relating to its CDS on CDO of ABS from 2006-2007.  As of this point, Ambac only took a minor write-down of $743 million in violation of GAAP and SFAS 133.  Had Ambac's financial statements for the quarter accurately reported this mark-to-market write-down, Ambac's reported net earnings would have declined from a reported loss of

$361 million to a loss of $6,314 million, and its earnings per diluted share would have declined from a reported loss of $3.53 per share to a loss of $61.73 per share.

98.    As of December 31, 2007, Ambac had exposure to $28.9 billion of CDS on CDO of ABS.  By this time, the 40-100 TABX had declined to approximately 18% of par.  Thus, by December 31, 2007, Ambac was required by GAAP and SFAS 133 to write-down at least an additional $3.672 billion relating to its CDS on CDO of ABS from 2006-2007.  On January 16, 2008, Ambac disclosed its first material mark-to-market write-down, disclosing $5.4 billion of the required amount.

99.    Thus, for the entire year of 2007, Ambac only took a reported write-down of approximately $6.1 billion on its CDO of RMBS.  Ambac was required by GAAP and SFAS 133 to write-down at least $17 billion for the year end December 31, 2007 relating to its CDS on CDO of ABS from 2006-2007.  Moreover, had Ambac's financial statements for the year ended December 31, 2007, properly accounted for the mark-to-market write-down, Ambac's reported net earnings for the year would have declined from a reported loss of $3.24 billion to a loss of $10.45 billion, and its earnings per diluted share would have declined from a reported loss of $31.56 per share to a loss of $101.57 per share.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

100.    During the Class Period, Defendants knew or were reckless in not knowing that: (i) mortgage originators had lowered their standards for underwriting residential mortgages that were being included in a wide range of RMBS; (ii) Ambac itself had changed its underwriting policies allowing it to assume riskier RMBS exposures than would have been allowed under the pre-existing policies; (iii) housing and credit market conditions deteriorated severely; (iv) the RMBS collateral that Ambac

insured directly and that supported Ambac's derivative CDO exposures was deteriorating in direct correlation to the performance of the RMBS comprising the collateral in the pertinent ABX and TABX indices; (v) Ambac violated GAAP by not properly taking mark-to-market write-downs on its CDO portfolio and by not taking adequate loss reserves on its RMBS portfolio; and (vi) as a result of the above, Ambac's public reports were materially false and misleading.

**2006 Third Quarter Statements**

> **A.    The October 25, 2006 Press Release and Conference Call**

101.    On October 25, 2006, Ambac issued a press release announcing its third quarter 2006 financial results which was incorporated by reference in the DISCS Registration Statement/Prospectus.  In the press release, Genader asserted:  "We are currently witnessing a solid level of deal inquiries and opportunities . . . .  We remain steadfast in judiciously allocating our capital to transactions that enable us to continue to deliver superior returns."

102.    During the conference call that same day, Leonard highlighted Ambac's conservatism in assuming mortgage-related exposures, stating that Ambac was "very selective in that sector" and that "our CDO portfolio, when we look at structured credit with MBS, we're also very cautious about mezzanine-type securities that come out of mortgage-backed securitizations.  So, we are taking a cautious position for underwriting reasons, but also the availability of profitable transactions is not as great as it has been in the past."

103.    These statements were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.      By 2006, the quality of mortgages comprising Ambac's direct RMBS and derivative CDO exposures declined because mortgage originators lowered their underwriting standards to meet the increased demand for mortgages to back RMBS securitizations.

b.      Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.

c.      As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics which were reviewed by defendants on not less than a monthly and quarterly basis.

### B.      The Third Quarter 2006 Form 10-Q

104.    On November 8, 2006, Ambac issued its Form 10-Q for the quarter ended September 30, 2006 (the "3Q06 Form 10-Q") which was incorporated by reference in the DISCS Registration Statement/Prospectus.  The 3Q06 Form 10-Q was signed by Leonard and included as exhibits Sarbanes-Oxley Certifications (the "Sarbanes-Oxley Certifications") signed by Defendants Genader and Leonard certifying, *inter alia*, that they had reviewed the 3Q06 Form 10-Q and, to their knowledge the (i) report did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report; and (ii) the financial statements and other financial information included in the report fairly present, in all material respects, the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in the report.

105.    The 3Q06 Form 10-Q described Ambac's "active surveillance" of its insured portfolio to identify "adversely classified" credits as follows:

> Active surveillance of the insured portfolio enables Ambac's Surveillance Group to track credit migration of insured obligations from period to period and prepare an adversely classified credit listing.  The active credit reserve is established only for adversely classified credits.  The criteria for an exposure to be included on the adversely classified credit listing includes *... **underperformance of the underlying collateral (for collateral dependent transactions such as mortgage-backed securitizations),** problems with the servicer of the underlying collateral **and other adverse economic events or trends . . . .**  (Emphasis added.)*

106.    The 3Q06 Form 10-Q disclosed that Ambac took active credit reserves based on, among other things, Ambac's information regarding "historical default information" and "internally developed loss severities."

107.    The 3Q06 Form 10-Q stated that "we note that the mortgage-backed and home equity ultimate [loss] severities have been better than or equal to our current severity assumption."  With respect to CDO obligations, the 3Q06 Form 10-Q stated that "Ambac considers the unique attributes of the underlying collateral and transaction."

108.    The above statements were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.      By 2006, the quality of mortgages comprising Ambac's direct RMBS and derivative CDO exposures declined because mortgage originators lowered their underwriting standards to meet the increased demand for mortgages to back RMBS securitizations.

b.      Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.

c.      As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative

trends in delinquencies and other key metrics which were reviewed by defendants on not less than a monthly and quarterly basis.

d.      Either Ambac conducted the surveillance it claimed, and Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process.

**2006 Fourth Quarter Statements**

**A.      January 31, 2007 Press Release and Conference Call**

109.    On January 31, 2007, Ambac issued a press release announcing its fourth quarter 2006 financial results which was incorporated by reference into the DISCS Registration Statement/Prospectus.   The press release disclosed that Ambac's total revenues were $454.3 million, and net income for the quarter was $202.7 million, or $1.88 per diluted share.   Ambac's loss and loss expense reserve was $220.1 million, a decrease from $304.1 million at the end of the prior year.   During Ambac's conference call that day, Leonard responded to questions about worsening trends reported in the mortgage sector by assuring investors that "from a surveillance perspective, we consider that and look for those types of trends, obviously trying to identify those early . . . but those are things that we specifically look for in the surveillance function."

110.    The January 31, 2007 press release also reported a net mark-to-market loss on financial guarantee credit derivative contracts in the fourth quarter of $838,000 and a net mark-to-market gain of $9.1 million for the year 2006.

111.    Investors and market analysts relied upon and responded favorably to Ambac's statements.   A January 31, 2007 Morgan Stanley report "continue[d] to recommend investors build a position in the ABK shares" and noted that Ambac had

"lower credit losses."  A February 8, 2007 Citigroup report commented favorably on the fourth quarter results and a meeting with Ambac senior management, in which Genader "emphasized that the portfolio cannot be measured in average terms because the financial guarantee model is predicated on zero-loss underwriting."  Based on comments from Managing Director Tom Gandolfo, Citibank also wrote that Ambac's "[d]ue diligence has been key to low losses . . . Not only does Ambac review the deal closely, but also is careful only to work with established CDO managers," and that keys to Ambac's success were its favorable "structure, access to collateral and good financial controls and financial resources."

112.    The above statements by Defendants were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.    By 2006, the quality of mortgages comprising Ambac's direct RMBS and derivative CDO exposures declined because mortgage originators lowered their underwriting standards to meet the increased demand for mortgages to back RMBS securitizations.

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics which were reviewed by defendants on not less than a monthly and quarterly basis.

d.      Either Ambac conducted the surveillance it claimed, and Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process.

**B.      The 2006 Form 10-K**

113.    On March 1, 2007, Ambac filed with the SEC its Form 10-K for the year ended December 31, 2006 (the "2006 Form 10-K"), which was signed by Defendants Leonard and Genader.   The 2006 Form 10-K was the last annual report filed by Defendants before the issuance of the STRATS securities.   This 2006 Form 10-K included Sarbanes-Oxley Certifications making the same representations as set forth in ¶ 104 above, and represented that Ambac's "Consolidated Financial Statements have been prepared in conformity with U.S. generally accepted accounting principles using management's best estimates and judgment."

114.    Ambac's 2006 Form 10-K reported the same loss and loss expense reserves, net earnings and net earnings per share, as reported in the January 31, 2007 press release, as set forth in ¶ 109, *supra*.  The 2006 Form 10-K reported net mark-to-market losses of $838,000 on financial guarantee credit derivative contracts for the fourth quarter and a gain of $9.1 million for the year.  Regarding its mark-to-market process, the 2006 Form 10-K disclosed:

> Ambac's exposure to derivative instruments . . . are accounted for at fair value under SFAS 133[]. Fair value is determined based upon market quotes from independent sources, when available.  When independent quotes are not available, fair value is determined using valuation models . . . . .  For derivatives that trade in less liquid markets, such as credit derivatives on synthetic collateralized debt obligations . . . a proprietary model is used because such instruments tend to be more complex and pricing information is not readily available in the market.

115.    With respect to the underwriting of structured finance products, the 2006 Form 10-K represented that "the amount and quality of asset coverage required is **determined by the historical performance of the underlying asset type** or the transaction's specific underlying assets." (Emphasis added.)  The 2006 Form 10-K also stated that, as part of the underwriting process, Ambac performed due diligence on its loan originators, a process that "**often entails on-site due diligence covering the parties to the transaction, such as the issuer, originator, services or manager.**" (Emphasis added.)

116.    In describing Ambac's "active surveillance" of its exposures, the 2006 Form 10-K stated as follows:

> The Surveillance Group is responsible for monitoring outstanding financial guarantee exposures, including credit derivatives.  The group's monitoring activities are designed to detect deterioration in credit quality or changes in the economic, regulatory or political environment which could adversely impact the portfolio.  Active surveillance enables Ambac Assurance's Surveillance Group to track single credit migration and industry credit trends . . . .
>
> . . . The focus of the surveillance review is to assess performance, identify credit trends and recommend appropriate classifications, ratings and review periods . . . .   Those credits that are either in default or have developed problems that eventually may lead to a claim or loss are tracked closely by the appropriate surveillance team and reported to management and Ambac's Board of Directors by preparation of an adversely classified credit listing.   Relevant information, along with the plan for corrective actions and a reassessment of the credit's rating and credit classification, is reviewed with senior management in regular adversely classified credit meetings . . . .
>
> Surveillance for collateral dependent transactions focuses on review of the asset and servicer performance, as well as, transaction cash flows.

117.    The 2006 Form 10-K stated, *inter alia*, that "[t]he criteria for an exposure to be included on the adversely classified credit listing includes . . . underperformance of the underlying collateral (for collateral dependent transactions such as mortgage-backed

securitizations), problems with the servicer of the underlying collateral and other adverse economic events or trends . . . ." The 2006 Form 10-K also stated that "mortgage-backed and home equity ultimate [loss] severities have been less than or equal to our current severity assumption." With respect to CDO obligations, the 2006 Form 10-K stated that "Ambac considers the unique attributes of the underlying collateral and transaction" and that "Ambac's exposure to CDOs in its classified portfolio is currently limited."

118.   The above statements were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.   By 2006, the quality of mortgages comprising Ambac's direct RMBS and derivative CDO exposures declined because mortgage originators lowered their underwriting standards to meet the increased demand for mortgages to back RMBS securitizations.

b.   Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.

c.   As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics which were reviewed by defendants on not less than a monthly and quarterly basis.

d.   Either Ambac conducted the surveillance it claimed, and Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process.

119.   The 2006 Form 10-K also contained a "Risk Factors" section, which was materially false and misleading because certain of the risks identified in the 2006 Form

43

10-K had already materialized, a fact not disclosed to investors.  In addition, certain

material risks known to Defendants were omitted from the 2006 Form 10-K.

120.    Under the heading "We are subject to credit risk throughout our

businesses, including large single risks and correlated risks," the 2006 Form 10-K stated

that:

> We are exposed to the risk that issuers of debt which we have insured (or
> with respect to which we have written credit derivatives) . . . may default
> on their financial obligations, whether as the result of insolvency, lack of
> liquidity, operational failure or other reasons . . . . Such credit risks may be
> in the form of . . . losses in respect of different, but correlated, credit
> exposures.

121.    The 2006 Form 10-K also included a risk factor entitled "General

economic conditions can adversely affect our business results and prospects."  This risk

factor spoke generically about how general market conditions could lead to losses for the

Company.  Another risk factor, under the heading "Changes in prevailing interest rate

levels could adversely impact our business results and prospects," stated that:

> Additionally, increasing interest rates could lead to increased credit stress
> on consumer asset-backed transactions in our insured portfolio (as the
> securitized assets supporting a portion of these exposures are floating rate
> consumer obligations); slower prepayment speeds and resulting "extension
> risk" relative to such consumer asset-backed transactions in our insured
> portfolio . . . .

122.    The above three "risk factors" were materially false and misleading

because, as Defendants knew or recklessly disregarded: (a) Ambac's lowering of

underwriting standards in its RMBS portfolios had already resulted in negative trends in

delinquencies and other key performance metrics and had increased the expectation that

"issuers of debt" that Ambac insured "may default" due to the failure of their underlying

collateral; (b) Ambac's changed underwriting policies increased the likelihood of highly

correlated defaults in Ambac's RMBS exposures; and (c) interest rates had already

increased while housing prices had declined, thereby increasing the expectation of defaults in Ambac's RMBS exposures. These risk factors with regards to credit risk and changes in prevailing interest rates were of particular importance to investors purchasing Ambac debt securities or ABS securities backed solely by Ambac debt securities.

123. The 2006 Form 10-K omitted any credit risk factor directly addressing Ambac's RMBS and CDO backed by RMBS exposures. Credit risk was a particularly important factor for investors purchasing Ambac debt securities or ABS securities backed solely by Ambac debt securities such as STRATS, since the only source of payment of interest and repayment of principal on such securities lie in Ambac's ability to make timely and complete payments of interest and principal on the debt securities collateralizing STRATS. This omission was material as Ambac effectively admitted on January 25, 2008, when it issued a Form 8-K in which Ambac "revised certain risk factors it previously disclosed in its Form 10-K for the year ended December 31, 2006." Among those "revised" risk factors was the following ***new*** risk disclosure, entitled, "We are subject to credit risk related to residential mortgage backed securities and CDOs of ABS":

> We have insured, and written credit default swaps ("CDS") with respect to, RMBS and CDOs of ABS and are thus exposed to credit risk associated with those asset classes. Performance of these transactions can be adversely affected by general economic conditions, including recession, rising unemployment rates, declining house prices and unavailability of consumer credit; mortgage product attributes, such as interest rate adjustments and balloon payment obligations; financial difficulty experienced by mortgage servicers; and, particularly in the case of CDOs of ABS, transaction-specific factors such as the lack of control of the underlying collateral security which can result in a senior creditor determining to liquidate underlying assets to the disadvantage of mezzanine and subordinated creditors and disputes between creditors with respect to the interpretation of legal documents governing the particular transaction.

Transactions within Ambac Assurance's insured RMBS and CDO portfolios also may be downgraded, placed on watch or subject to other actions by the three rating agencies that have granted Ambac Assurance its triple-A claims-paying ratings.  Such ratings or other actions could require Ambac Assurance to maintain a material amount of additional capital to support the exposures it has insured.  This could cause us to:

- have to raise additional capital, if available, on terms and conditions that may be unfavorable;

- curtail the production of new business; or

- pay to reinsure or otherwise transfer certain of its risk exposure.

124.   The failure to disclose the above risk in Ambac's 2006 Form 10-K was material.  Further, the above risk disclosure was entirely based on information known and available to Defendants when the 2006 Form 10-K was issued.

**2007 First Quarter Statements**

    **A.**    **The April 25, 2007 Press Release and Conference Call**

125.   On April 25, 2007, Ambac issued a press release announcing its first quarter 2007 financial results which was filed with the SEC as an exhibit to a Report on Form 8-K.  The press release disclosed that Ambac's total revenues were $461.8 million, and net income for the quarter was $213.3 million, or $2.02 per diluted share.  Financial Guarantee net mark-to-market losses on credit derivatives contracts were $5.124 million.  Ambac's loss and loss expense reserve was $231.3 million, a modest increase from $220.1 million at the end of the prior year.  Genader stated that "recent evidence of credit spread widening in the mortgage related asset classes should lead to increased demand for our core financial guarantee product, provided of course, that wider spreads continue to prevail."  The press release also stated that "[d]uring the quarter, Ambac benefited from increased writings in utilities, structured insurance and pooled debt obligations

(CDOs)" and that "Ambac remains focused on achieving the best risk-rated returns and will remain disciplined until pricing in this product is commensurate with the level of risk."

126.    During an Ambac conference call that day concerning Ambac's first quarter results, Leonard discussed "the subprime and mid prime sectors of MBS, as well as, CDOs containing large components of this asset type" and claimed that "[w]e will continue to be selective in the nature of the business we write, and are obviously hopeful that this pricing trend will continue."  Leonard added that "We will continue to maintain discipline and seek to underwrite those transactions where our superior financial strength, experience and reputation in the market is most valued."

127.    During the question and answer session of the call, Leonard stated that Ambac had "very current information – information, pool information up through the end of March, so very current," and that Ambac was "able to analyze that on a very current basis and look for trends of the underlying performance."  Based on this supposed "current" monitoring, Leonard asserted that "[w]e just haven't seen -- certainly not significant deterioration, as you can tell from the comments I made on below investment-grade . . . .  We're just not seeing deterioration up through March that wasn't expected."

128.    Investors and analysts relied upon these material statements.  Bank of America, on April 26, maintained its "Buy" rating on the stock, stating that Ambac "is entering a ***sweet spot*** as signs of further gradual credit spread widening are emerging and exposure to areas of concern – namely subprime and Alt-A – are limited."  (Emphasis in original.)  Citigroup commended Ambac for its "[s]elective MBS writings," noting that

Ambac "continue[s] to minimize subprime writings" and that Ambac's RMBS exposure was "very well contained and selected."

129.    The above statements by Defendants were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.    By 2006, and continuing thereafter, the quality of mortgages comprising Ambac's direct RMBS and derivative CDO exposures declined because mortgage originators lowered their underwriting standards to meet the increased demand for mortgages to back RMBS securitizations.

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics which were reviewed by defendants on not less than a monthly and quarterly basis.

d.    Either Ambac conducted the surveillance it claimed, and Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process.

e.    Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS.   Had Ambac's financial statements for the quarterly period ended March 31, 2007 properly accounted for the mark-to-market write-down of $2.068 billion, Ambac's reported net earnings would have

declined from a reported profit of $213 million to a loss of $1.311 billion, and its earnings per diluted share would have declined from a reported profit of $2.04 per share to a loss of $12.53 per share.

### B.   The First Quarter 2007 Form 10-Q

130.   On May 10, 2007, Ambac filed with the SEC its Form 10-Q for the quarter ended March 31, 2007 (the "1Q07 Form 10-Q"). The 1Q07 Form 10-Q was signed by Leonard and included as exhibits Sarbanes-Oxley Certifications signed by Genader and Leonard that made the representations set forth at ¶ 104, *supra*.

131.   The 1Q07 Form 10-Q represented that Ambac's consolidated unaudited interim financial statements were prepared on the basis of GAAP. The 1Q07 Form 10-Q also reported the same loss and loss expense reserves, mark-to-market adjustments, net earnings and net earnings per share, as reported in the April 25, 2007 press release, as set forth in ¶ 125, *supra*. The 1Q07 Form 10-Q disclosed that net mark-to-market losses on credit derivative contracts for the three months ended March 31, 2007 were $5.1 million, compared to net mark-to-market gains of $2.0 million in the three months ended March 31, 2006.

132.   The 1Q07 Form 10-Q repeated the statements quoted at ¶¶ 105, 117, *supra*, regarding: (a) Ambac's "active surveillance" of its insured portfolio to identify "adversely classified" credits, including determining whether there was "underperformance of the underlying collateral"; (b) the process by which an active credit reserve is established; and (c) RMBS and CDO "loss severity assumptions."

133.   The 1Q07 Form 10-Q also repeated the statement made in the 2006 Form 10-K, quoted at ¶ 114, *supra*, about Ambac's use of proprietary valuation models.

134.     The above statements were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.     By 2006, and continuing thereafter, the quality of mortgages comprising Ambac's direct RMBS and derivative CDO exposures declined because mortgage originators lowered their underwriting standards to meet the increased demand for mortgages to back RMBS securitizations.

b.     Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.

c.     As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics which were reviewed by defendants on not less than a monthly and quarterly basis.

d.     Either Ambac conducted the surveillance it claimed, and Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process.

e.     Ambac's "proprietary model" to mark its CDO exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices.

f.     Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, based on the failure to properly mark-to-market the true value of its CDO-related exposures.  Had Ambac's financial statements for the quarterly period ended March 31, 2007 properly accounted for the mark-to-market write-down of $2.068 billion, Ambac's reported net earnings would have

declined from a reported profit of $213 million to a loss of $1.311 billion, and its earnings per diluted share would have declined from a reported profit of $2.04 per share to a loss of $12.53 per share.

**Second Quarter 2007 Statements**

       **A.**      **The July 25, 2007 Press Release and Conference Call**

     135.    On July 25, 2007, Ambac issued a press release announcing its second quarter 2007 financial results which was filed with the SEC as an exhibit to a Report on From 8-K. Ambac reported second quarter net income of $173.0 million, or $1.67 per diluted share. Financial guarantee net mark-to-market losses on credit derivative contracts were $56.9 million, and Ambac's loss and loss expense reserve was $255.8 million, a slight increase from $231.3 million at the end of the prior quarter. The press release attributed the minor mark-to-market write-down to unfavorable market pricing of CDOs containing subprime RMBS collateral.

     136.    The press release disclosed that Ambac's Active Credit Reserve "increased by $14.9 million during the quarter, from $188.8 million at March 31, 2007, to $203.7 million at June 30, 2007," which was "driven primarily by increases in reserves on certain credits primarily within the transportation sector of the U.S. public finance portfolio and to a lesser extent within the non-subprime RMBS sector of the structured finance portfolio . . . ."

     137.    In the press release, Genader highlighted that "[o]ur ***rigorous and proven approach*** enabled us to deliver positive results despite the turmoil in the sub-prime mortgage market" and that "***in the unlikely event of default*** we pay scheduled principal and interest, thereby minimizing liquidity risk." (Emphasis added.) Genader also stated that Ambac's "disciplined execution" of its approach would allow it "to benefit from the

improving business conditions we see, with wider spreads, enhanced credit terms and increased demand for our valuable financial guarantee products."

138.    On July 25, 2007, Ambac held a conference call discussing the financial results released that day chaired by Leonard, who reiterated the "unlikely event of default" on any CDO exposures.  Leonard attributed the $56.9 million mark-to-market decline to the "lack of liquidity in CDOs of ABS" in the market, and highlighted that "*[o]n these transactions, as with all of our CDO exposure, Ambac expects that mark-to-market adjustments in either direction will reverse through the income statement over time as the transactions move towards maturity*."  Leonard also stated that Ambac had been "*conservative*" in its underwriting, that "*our strongest writings were in CDOs of ABS where we have been cautious and selective . . . .*" and that "*Ambac remains diligent in structuring of transactions, particularly in those asset classes where demand for our product is improving.*"  (Emphasis added.)

139.    Similarly, Ambac Senior Managing Director Gandolfo emphasized that Ambac "does not underwrite based solely on the deal's public rating" and that "[w]e believe our credit-risk analysis goes far beyond that which a typical CDO investor would perform."  Gandolfo stated that Ambac puts each deal through a "rigorous review process," including "a rigorous review of the CDO manager" a "detailed assessment of the triggers and control rights embedded in the CDO" and a "detailed review and re-rating of the underlying RMBS collateral in the deal," including a base case and stress case model.

140.    Gandolfo further stated that reference to the ABX and TABX indices in marking Ambac's CDO exposures to market was misplaced:

I look at the same indexes that you look at. It is really hard, right now, to know how much of that spread widening is fundamental and how much is technical . . . .

***What we do is, when we look at our deals, we don't feel we underwrite the market.*** (Emphasis added.)

141. With respect to Ambac's RMBS book, Leonard disclosed internal rating downgrades of pre-2004 transactions, highlighting that investors should take comfort by Ambac's ability to track the performance of underlying collateral on a monthly basis and stated that "over the entire portfolio, we are not seeing" increased stress. "I think that's largely due to selectivity" and the supposedly safer nature of the collateral Ambac insured, Leonard explained.

142. Defendants' statements were highly material and relied upon by investors and market analysts. For example, a July 25, 2007 Morgan Stanley report highlighted that "[t]he company's in-depth discussion on the conference call about how it protects itself against CDO losses and the favorable outlook for new business seemed to go a long way toward alleviating investor concerns . . . ." The next day, a Deutsche Bank report emphasized that Ambac has a "**Rigorous CDO underwriting process**" and that **"Ambac is not the market."** (Emphasis in original.) With regard to the latter point, the report added:

> If we assume that its underwriting was done properly, its credit performance should not reflect the average or fall even close to the average. Historically, that has been true as Ambac's paid claims has totaled only 2.6 basis points of the par that it has insured. We do not believe this time is different with CDOs and the RMBS market . . . . Given Ambac's strict underwriting standards, risk assessment skills, and small exposure relative to the overall market, we believe Ambac will not suffer from credit losses.

143. The above statements by Defendants were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.     By 2006, and continuing thereafter, the quality of mortgages comprising Ambac's direct RMBS and derivative CDO exposures declined because mortgage originators lowered their underwriting standards to meet the increased demand for mortgages to back RMBS securitizations.

b.     Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.

c.     As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics which were reviewed by defendants on not less than a monthly and quarterly basis.

d.     Either Ambac conducted the surveillance it claimed, and Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process.

e.     Contrary to Gandolfo's statement that Ambac does not "underwrite the market," in fact, the collateral underlying Ambac's exposures deteriorated in line with the collateral comprising the pertinent market indices.

f.     Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS.   Had Ambac's financial statements for the quarterly period ended June 30, 2007 properly accounted for the mark-to-market write-down of $2.716 billion, Ambac's reported net earnings would have declined from a reported profit of $173 million to a loss of $1.810 billion, and its

earnings per diluted share would have declined from a reported profit of $1.69 per share to a loss of $17.65 per share.

> **B.      The Second Quarter 2007 Form 10-Q**

144.    On August 9, 2007, Ambac filed with the SEC its Form 10-Q for the quarter ended June 30, 2007 (the "2Q07 Form 10-Q").  The 2Q07 Form 10-Q was signed by Leonard and included as exhibits Sarbanes-Oxley Certifications signed by Defendants Genader and Leonard that made the representations set forth at ¶ 104, *supra*.

145.    The 2Q07 Form 10-Q represented that Ambac's consolidated unaudited interim financial statements were prepared on the basis of GAAP.  The 2Q07 Form 10-Q reported the same loss and loss expense reserves, mark-to-market adjustments, net earnings and net earnings per share, as reported in the July 25, 2007 press release, as set forth in ¶ 135.

145.    The 2Q07 Form 10-Q repeated the statements quoted at ¶¶ 105, 117, *supra*, regarding: (a) Ambac's "active surveillance" of its insured portfolio to identify "adversely classified" credits, including determining whether there was "underperformance of the underlying collateral; (b) the process by which an active credit reserve is established; and (c) RMBS and CDO "loss severity assumptions."

146.    The 2Q07 Form 10-Q repeated the statements made in the 2006 Form 10K quoted at ¶ 114, *supra* about the use of proprietary valuation models.  The 2Q07 Form 10-Q stated that the previously disclosed net mark-to-market loss on credit derivative contracts for the quarter of $56.9 million was "related to collateralized debt obligations of asset-backed securitizations ("CDO of ABS") containing sub-prime mortgage-backed securities as collateral."

147.    Notably, the 2Q07 Form 10-Q disclosed that Ambac's $26.3 billion of exposures to CDO of high-grade RMBS "have underlying collateral that consist of 39% subprime RMBS, 36% RMBS and 13% mezzanine CDO exposures" and surprised the market by stating that "we have noted a continued widening of credit spreads across the derivative portfolio, particularly CDO of ABS and collateralized loan obligations, resulting in additional mark-to-market losses."  The market reaction was immediate, with Ambac's shares declining $2.00 within minutes of the filing of the Form 10-Q.  Ambac's stock price closed at $69.50, a decline of $2.90 per share from the August 8 closing price of $72.40 per share.  Ambac stock continued to decline in the following days, closing at $66.14 on August 10 and $56.00 by August 15.

148.    Analysts continued to accept and react positively to Ambac's statements. An August 15, 2007 Citigroup analyst report discussed a meeting that day with management and noted that the "conservative" management team "appears very comfortable that losses will be minimal."  An August 23, 2007 Piper Jaffrey analyst report, which commented on a recent Ambac web disclosure on its CDO underwriting, listed "key takeaways" from the disclosure, including that Ambac engaged in "a highly regimented process for underwriting CDO of ABS transactions," which involved a "dedicated team of underwriters," with "all transaction risk and return modeling" performed by a separate and "dedicated group of professionals in Risk Analysis and Reporting."  Piper Jaffrey also highlighted Ambac's "*review of the underlying collateral*, analytic modeling of case and stress case scenarios, Sr. Credit Committee processes and legal review."  (Emphasis added.)  The Piper Jaffrey report noted, however, that in the end, only Ambac had access to the information needed to accurately assess the quality of

its exposures and investors were left to trust Ambac's internal models and representations about its processes: "***Despite any analyst or investor's best attempt, the information flow on a deal by deal basis simply can not be granular enough to come to any real conclusion about these very protections, let alone knowing whether or not they exist in any specific deal***."  (Emphasis added.)

149.    The above statements by Defendants were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.    By 2006, and continuing thereafter, the quality of mortgages comprising Ambac's direct RMBS and derivative CDO exposures declined because mortgage originators lowered their underwriting standards to meet the increased demand for mortgages to back RMBS securitizations.

b.    Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and in CDOs backed by RMBS showed negative trends in delinquencies and other key metrics which were reviewed by defendants on not less than a monthly and quarterly basis.

d.    Either Ambac conducted the surveillance it claimed, and Defendants knew of but did not disclose these negative trends, or Ambac misrepresented its surveillance process.

e.    Ambac's "proprietary model" to mark its CDS exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices.

f.      Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS.   Had Ambac's financial statements for the quarterly period ended June 30, 2007 properly accounted for the mark-to-market write-down of $2.716 billion, Ambac's reported net earnings would have declined from a reported profit of $173 million to a loss of $1.810 billion, and its earnings per diluted share would have declined from a reported profit of $1.69 per share to a loss of $17.65 per share.

**Third Quarter 2007 Statements**

**A.      The October 10, 2007 Press Release**

150.      After the close of the market on October 10, 2007, Ambac issued a press release announcing its "Estimate of Unrealized Mark-to-market Loss on Its Credit Derivative Portfolio" for the third quarter which was filed with the SEC as an exhibit to a Report on Form 8-K.   The press release sought to reassure the market that any mark-to-market write-downs were contained and did not represent ultimate losses, but merely were caused by liquidity issues that would not affect Ambac, and that Ambac remained confident about its structured finance exposure.   The press release disclosed that Ambac expected to take a $743 million loss on its credit derivative portfolio and that Ambac "[e]xpected to report" a "loss provision of approximately $20 million" for the quarter. Ambac expected to report a loss of $3.43 per diluted share.

151.      The press release quoted Genader as stating that despite "the turmoil in the structured finance markets," which resulted in the mark-to-market loss, "***I remain confident in our underwriting abilities, credit standards and the transactions we have***

*insured*."   (Emphasis added.)   The press release also quoted Leonard, stating that "Ambac does not view the current adjustments as predictive of future claims . . . . Indeed, the average internal credit rating of our derivative portfolio is AA+ at September 30, 2007 and based on our recent analysis of the portfolio, management believes that the potential for material paid claims is very low."   Investors and analysts credited these statements.

152.   Financial analysts' reaction to Ambac's October 10 disclosures was favorable.   An October 11, 2007 Dow Jones article attributed the increase in Ambac's stock price to the press release "calm[ing] concerns about the impact of the mortgage crisis on the company," and an October 11, 2007 Morgan Stanley report concluded that, "[w]hile the size of the mark [to market] may cause a negative short-term market reaction, it does not change our fundamental view of the company."   An October 11, 2007 Bank of America analyst report stated: "[w]e view Ambac's pre-announcement as a net positive," adding that "***It all comes down to underwriting standards and the bond insurers have a long and strong track record of high-quality underwriting with minimal losses as a percentage of par outstanding***."   (Emphasis added.)

153.   The above statements by Defendants were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.   Genader omitted that Ambac had lowered its own underwriting standards in order to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS, and that the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics.

b.      Contrary to Leonard's statements, the reported mark-to-market write-down in fact was drastically lower than an appropriate write-down based upon the actual performance of Ambac's CDS portfolio at that time, which would have reflected underlying collateral deterioration.

c.      The widening of credit spreads and better pricing in mortgage-backed structured finance reflected growing risk and expected losses on RMBS-related instruments.  The widening spreads in fact indicated that the value of Ambac's pre-existing RMBS-related exposure was significantly declining, which would result in a mark-to-market loss and increased impairments and loss reserves in Ambac's financial statements.

d.      Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS.  Had Ambac's financial statements for the quarterly period ended September 30, 2007 properly accounted for the mark-to-market write-down of $8.923 billion, Ambac's reported net earnings would have declined from a reported loss of $361 million to a loss of $6.314 billion, and its earnings per diluted share would have declined from a reported loss of $3.53 per share to a loss of $61.73 per share.

### B.      The October 24, 2007 Press Release and Conference Call

154.    On October 24, 2007, Ambac issued a press release announcing its third quarter 2007 financial results that was filed with the SEC as an exhibit to a Report on Form 8-K.  Ambac reported a third quarter net loss of $360.6 million, or $3.51 per diluted

share, which it attributed to the previously announced $743 million loss on credit derivative exposures. Ambac's loss and loss expense reserve was $278.7 million, an increase from $255.8 million at the end of the prior quarter.  The press release made several new disclosures, including that Ambac's case basis credit reserves increased by $59.8 million from $47.3 million at June 30, 2007 to $107.1 million at September 30, 2007, and that the increase "relates primarily to two RMBS transactions that are underperforming original expectations."

155.    During Ambac's conference call discussing these financial results that same day, Leonard again reassured the investment community that Ambac's mark-to-market losses were transitory and did not represent a likelihood of future claims. Leonard added, "[s]ince all of our credit derivative transactions are performing and are rated internally above investment grade, no adjustment to operating earnings is considered necessary."  Leonard reiterated that the mark-to-market write-down "***does not translate into expectations for claim payments***" and that "***we do not expect to pay any claims***."  (Emphasis added.)

156.    Leonard then explained that the $59.8 million increase in base reserves was "primarily due to two recent HELOC transactions that are clearly underperforming our original expectations, and as a result, have been internally rated below investment grade."  To further allay investor concerns regarding Ambac's direct RMBS portfolio, Defendant Wallis assured investors that the two HELOCs were "idiosyncratic" in terms of their structure and "very poor performance," which "led to the very early loss."

157.    Leonard reinforced Ambac's carefully crafted image of being safer than the market, holding higher quality exposures, and being able to weather the storm already

hitting big banks which held some of the same RMBS securities Ambac was insuring and which served as Ambac's CDS counterparties.  Leonard highlighted that Ambac's "below investment grade exposures remained flat during the quarter at $4.7 billion; were less than 1% of our total portfolio" and that "even under these stressful conditions, most of our transactions are performing; remain rated within the investment grade category . . . . As always, we will continue to actively monitor these transactions, closely analyzing collateral performance and then consider structural protections available to us."

158.    Analysts accepted Ambac's statements about the performance of its CDO and RMBS exposures.  For example, Bank of America on October 24, 2007 issued a report entitled, "In Our View, It'll Be Worth the Ride."  The report accepted Ambac's assurance that its portfolio should not be compared to the weak securities in the marketplace, reiterating the Company's mantra:  "***Underwriting discipline is the key to the divergence we expect to see between the performance of Ambac's insured portfolio and the continued deterioration in the general marketplace***."  (Emphasis added.)  A Fox-Pitt report dated October 24, 2007 highlighted that "[t]he company indicated" that the two HELOC deals driving the increased loss reserves "were uncharacteristic of other deals . . ." and "[t]he Company stated that there are no other deals like these."  A William Blair analyst report concluded that the reserves for the two HELOC transactions were not "indicative of any specific problems within the HELOC segment."

159.    The above statements by Defendants were designed to assure the market that Ambac's RMBS-related direct and derivative exposures remained safe.  Many investors and analysts credited these statements which were false and misleading because Defendants misrepresented and/or failed to disclose that:

a.     Ambac had lowered its underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS, and that the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics which were so severe as to require substantially higher loss reserves and mark-to-market write-downs.

b.     Either Ambac conducted the surveillance it claimed, and Defendants knew of these negative trends but did not disclose them, or Ambac misrepresented its surveillance process.

c.     Ambac's "proprietary model" to mark its CDS exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices.

d.     Ambac's financial statements for the quarter violated GAAP by materially misstating Ambac's assets and liabilities, net income and earnings per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on RMBS.   Had Ambac's financial statements for the quarterly period ended September 30, 2007 properly accounted for the mark-to-market write-down of $8.923 billion, Ambac's reported net earnings would have declined from a reported loss of $361 million to a loss of $6,314 billion, and its earnings per diluted share would have declined from a reported loss of $3.53 per share to a loss of $61.73 per share.

C.     The November 1, 2007 CNBC Interview

160.     On November 1, 2007, Genader gave an interview on the floor of the New York Stock Exchange that was broadcast on CNBC.  Genader stated that:

First of all, we use our own ratings, and so we rate the transactions. All of them are Triple A. And how we actually dig into them is that we drill down. In the case of some of our transactions we will look at 15,000 individual [Cusips], we will then project current rates of loss, and future rates. We are very comfortable with that portfolio and our detailed analysis that we update every single month.

161. Genader also reassured the market that "there clearly is a disconnect between the value of our portfolio, which is in very good shape, versus what has happened in the stock price in the last couple of months;" that "[o]ur company is very solid and very safe;" and that Ambac's "stock price is definitely too low." Genader also stated that Ambac engages in "good selection and the initial underwriting" and "[g]ood modeling to ensure that you are dealing with the best possible issuers." Genader insisted that "[o]ur performance, as Ambac, is very different than the rest of the market."

162. The above statements were false and misleading because Genader misrepresented and/or failed to disclose that:

a.     After Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics which were so severe as to require substantially higher reserves.

b.     Either Ambac conducted the surveillance it claimed, and Defendants knew of these negative trends but did not disclose them, or Ambac misrepresented its surveillance process.

c.     Ambac's proprietary model used to mark its CDO exposures ignored that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices.

64

**D.** **The November 6, 2007 Press Release**

163.   On November 2, 2007, Morgan Stanley issued a report that lowered the firm's ratings on the financial guarantee industry to "in-line" from "attractive" and raised concerns that additional losses at Ambac could force the Company to raise capital to protect its triple-A rating.   The report openly questioned whether Ambac should be placing greater reliance on the ABX and TABX indices when marking its own CDS exposures.

164.   Ambac attempted to refute the report and reassure investors in an extraordinary press release on November 6, 2007.   The press release disputed the analyst's contention that Ambac's reported mark-to-market losses were too low compared to Merrill Lynch's recently disclosed write-downs on seemingly similar CDO exposures, stating, *inter alia*, that "[s]everal differences may exist between exposures contained in Ambac's portfolio and an investment bank's portfolio and therefore may influence the estimated mark of the different portfolios."  These differences could include exposure to different vintages of mortgages, "the amount of first loss subordination and credit migration triggers present in a structure," and that "Ambac CDS contracts do not include collateral posting provisions, and are generally limited to payment shortfalls of interest and principal," which "have significant value, particularly in difficult markets." As to its mark-to-market valuation, Ambac also stated:

> Ambac believes that only through rigorous analytics of the actual transaction and its attributes and protections, as well as performance to date and expected future performance of underlying collateral, will one obtain meaningful information on the potential for actual losses.

165.   The November 6, 2007 press release disputed the analyst's assertion that "[w]e are increasing our CDO loss expectations for both Ambac and MBIA to reflect an

updated tally of various market opinions about cumulative sub prime losses." The press release responded that:

> It appears that the "various market opinions" referred to in the analyst's report relate to the 2006 and early 2007 vintage sub prime. *It also appears that he is assuming that the Ambac ABS CDO book will reflect the performance of the ABX index of 2006 and 2007 vintage sub prime collateral and ignores the actual vintage diversification and asset quality triggers inherent in Ambac's book*. (Emphasis added.)

166.   The above statements were materially false and misleading because, irrespective of Ambac's claims of potential differences between its and a typical investment bank's CDO exposures, in fact, the performance of the collateral in Ambac's CDO exposures was closely following the performance of the general market. Ambac's CDO exposures were not performing better, as Ambac suggested, but in fact were deteriorating just as rapidly as the remainder of the market. Accordingly, Ambac's mark-to-market losses were much higher than the losses it had reported at the time. Ambac's statements were also false and misleading because, while Ambac suggested that "an unrealized loss may not result in an increased expectation of loss," in fact, Ambac's CDO exposures were deteriorating at a rate at which realized losses were virtually certain.

### E.   The November 7, 2007 Conference Call

167.   On November 7, 2007, Ambac held a public senior management conference call. The purpose of the call was to correct what Genader described as "a significant and painful [stock price] drop in the last few weeks that has been caused by a number of misperceptions about the industry in general and misperceptions about Ambac specifically . . . . I hope to be able to calm the stories and restore the faith in the credit underwriting skills and surveillance and remediation capabilities that this Company has displayed for more than 35 years." These "misperceptions" were, *inter alia*, that (1)

"mark-to-market equals real losses," (2) "Ambac's insured portfolio mirrors the ABX,"
(3) "rating agencies are about to downgrade" Ambac, and that (4) Ambac's "$14 billion
capital is inadequate."   Genader also stated that "Ambac underwrites to withstand
stretched market conditions," and that he was "pleased with the results of our most recent
drill-down analysis of our CDO squared portfolio" and "[o]ur track record of risk taking
has been proven."

168.    Leonard added that an "unrealized mark-to-market on an investment grade
credit is not expected to result in a loss."   David Wallis, Ambac's Senior Managing
Director and Head of Portfolio and Market Risk Management stated that Ambac was
"giving our HELOC and closed-end second portfolios particular scrutiny," and that the
reserves Ambac took in the third quarter "*encompass what we believe to be reasonable
whole-life estimates of potential future claims, principally with regard to investment
bank shelf HELOC transactions*."   Wallis also assured investors that there were only
"limited cases where we are experiencing issues such as those referenced above," and
that "*[w]e will continue to take timely and appropriate internal rating and reserving
actions as future performance and analysis dictates*."

169.    The above statements by Defendants were false and misleading because
Defendants misrepresented and/or failed to disclose that:

a.    After mortgage originators lowered their underwriting standards,
Ambac had lowered its own underwriting standards to allow it to accept greater risk
characteristics in RMBS exposures and in CDOs backed by RMBS, and the collateral
supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other

key metrics.  This deterioration was so severe as to require substantially higher loss reserves and mark-to-market write-downs.

        b.      Leonard's insistence that reported mark-to-market losses did not indicate realized losses omitted that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices.

        c.      Wallis's assurances about Ambac's HELOC and CES exposures falsely omitted that the weaker characteristics and poor performance extended far beyond the two deals giving rise to the disclosed reserve increases.

        d.      Ambac's CDO exposures were deteriorating rapidly, and Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time.

        e.      Due to the real and dramatic deterioration in the underlying assets of Ambac's RMBS-related portfolio, Ambac's $14 billion capital was inadequate and, accordingly, Ambac was in danger of losing and ultimately did lose its AAA rating from all three rating agencies.

       **F.**       **The Third Quarter 2007 Form 10-Q**

    170.    On November 9, 2007, Ambac filed with the SEC its Form 10-Q for the quarter ended September 30, 2007 (the "3Q07 Form 10-Q").  The 3Q07 Form 10-Q was signed by Leonard and included as exhibits Sarbanes-Oxley Certifications signed by Defendants Genader and Leonard that made the representations set forth at ¶ 104, *supra*.

    171.    The 3Q07 Form 10-Q represented that Ambac's consolidated unaudited interim financial statements were prepared on the basis of GAAP.  The 3Q07 Form 10-Q

reported the same reserves, mark-to-market adjustments, net earnings and net earnings per share, as reported in the October 24, 2007 press release, as set forth in ¶ 154.

172.    The 3Q07 Form 10-Q disclosed active credit reserves of $166.7 million and case base reserves of $822.1 million at September 30, 2007, with the increase in case base reserves attributed to the default of several mortgage-backed transactions.  Like Ambac's prior Form 10-Q, the 3Q07 Form 10-Q touted Ambac's establishment of active credit reserves using "historical default information" and "internally developed loss severity assumptions," and Ambac's "active surveillance" to identify "adversely classified" credits quoted.  The 3Q07 Form 10-Q also repeated the statements in the 2Q07 Form 10-Q that: (1) "Loss severity estimates are based upon available evidence" and (2) "Ambac's exposure to CDOs in its classified credit portfolio is currently limited."

173.    The above statements were materially false and misleading for the reasons set forth in ¶ 159, above.

### G.    The November 13, 2007 Form 8-K

174.    On November 13, 2007, Ambac filed with the SEC a Form 8-K that contained "Frequently Asked Questions" ("FAQs") that were originally posted on Ambac's website on November 9, 2007.  The FAQs represented that:

> Ambac does not rely on the agencies in either approving transactions or assigning internal ratings to the deals it approves.  ***We conduct our own independent analysis of each transaction and the transaction is reviewed by one of our respective Senior Credit Committees pursuant to our credit process and policies.***  The Committee also evaluates the recommended rating for the transaction at that time.  Closed transactions are analyzed by our Portfolio Risk Management Group; and our original internal ratings are confirmed or revised, as appropriate.  (Emphasis added.)

175.    The FAQs also stated that, "absent any real credit losses, any MTM adjustments will reverse over time" and that "[i]n fact, Ambac is not a proxy for the

mortgage market: we are not a mortgage guarantor, ***we did not wrap any of the deals on the ABX index*** and we have wrapped only a fraction of the hundreds of deals that have been downgraded by S&P, Moody's and Fitch."   With respect to Ambac's RMBS underwriting, the FAQs represented that Ambac's subprime RMBS exposure "has steadily decreased . . . [as] a result of Ambac having been very selective in underwriting new direct RMBS exposure in the last two years."  (Emphasis added.)

176.    The FAQs also represented that "[o]f the $18.2Bn of HELOC and Closed End Seconds, over 91% ha[ve] performed within our expectations and [are] currently rated by AMBAC at or above the assigned ratings given at the time the transactions closed" and that "Ambac believes that the risk of loss [for its mezzanine CDO exposures] remains at an investment grade level."

177.    The above statements were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.    After mortgage originators lowered their underwriting standards, Ambac had lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS, and the collateral supporting Ambac's RMBS-exposures showed negative trends in delinquencies and other key metrics.  This deterioration was so severe as to require substantially higher loss reserves and mark-to-market write-downs.

b.    Notwithstanding Ambac's claim that it "did not wrap any of the deals on the ABX index," in fact, about two-thirds of those deals were included in Ambac's CDO exposures.

c.      Ambac's insistence that reported mark-to-market losses did not indicate realized losses omitted that the collateral underlying Ambac's exposures performed in line with the collateral comprising the pertinent market indices.   Ambac's CDO exposures were deteriorating rapidly, and Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time.

d.      Ambac's HELOC and closed-end second portfolios in fact were experiencing substantial deterioration, and the problems in those portfolios were not limited as Ambac suggested, nor had Ambac engaged in the "very selective underwriting" of its RMBS direct exposures that it claimed.

**2007 Fourth Quarter Statements**

**A.      The January 16, 2008 Press Release**

178.      On January 16, 2008, Ambac issued a press release in which it announced, *inter alia*, that it was cutting its dividend, had replaced Genader with Callen as interim CEO, and estimated a $5.4 billion mark-to-market loss on its credit derivative portfolio for the quarter, including a $1.1 billion credit impairment.  The press release also stated that Ambac expected to report a net loss "of up to $32.83" for the quarter.

179.      The press release disclosed that the loss was due to Ambac's "fourth quarter fair value review of its outstanding credit derivative contracts," and that, outside of the $1.1 billion credit impairment charge taken by Ambac, "***Ambac continues to believe that the balance of the mark-to-market losses taken to date are not predictive of future claims*** and that, in the absence of further credit impairment, the cumulative marks would be expected to reverse over the remaining life of the insured transactions." (Emphasis added.)  The press release also disclosed that Ambac expected to report a $143

million pre-tax loss provision "relates primarily to underperforming home equity line of credit and closed-end second lien RMBS securitizations."

180.    The press release was materially false and misleading because Defendants misrepresented and/or failed to disclose that:

    a.    The performance of the collateral in Ambac's CDO exposures was closely following the performance of the general market indices; Ambac's CDO exposures were not performing better, as Ambac was suggesting, but in fact were deteriorating just as rapidly, and Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time.

    b.    The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures. Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS-backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly.

    c.    Ambac's reported write-down as of December 31, 2007, of only $5.4 billion, was materially lower than an appropriate write-down based upon the actual performance of Ambac's CDS portfolio at that time, which would have reflected underlying collateral deterioration.  Thus, for the entire year of 2007, Ambac only took a total of approximately $6.1 billion write-down on its CDO of RMBS.  Ambac was required by GAAP and SFAS 133 to write-down at least $17 billion for the year end December 31, 2007 relating to its CDS on CDO of ABS from 2006-2007.  Had Ambac's financial statements for the year ended December 31, 2007 properly accounted for the

mark-to-market write-down, Ambac's reported net earnings for the year would have declined from a reported loss of $3.24 billion to a loss of $10.45 billion, and its earnings per diluted share would have declined from a reported loss of up to $32.83 per share to a loss of $101.57 per share.

d.      Due to the undisclosed dramatic deterioration in the underlying assets of Ambac's direct RMBS exposure, Ambac's reserves for the quarter were materially understated, and Ambac's net assets and liabilities, income and income per share were materially overstated.

### B.      The January 22, 2008 Press Release and Conference Call

181.    On January 22, 2008, Ambac issued a press release announcing its fourth quarter 2007 financial results which was filed with the SEC as an exhibit to a Report on Form 8-K.  For the quarter, Ambac reported a net loss of $3.25 billion, or $31.85 per share.  Financial guarantee net mark-to-market losses on credit derivatives contracts were $5.2 billion, including an estimated credit impairment of $1.1 billion.  Ambac's loss and loss expense reserve was $484.3 million, an increase from $255.8 million at the end of the prior quarter.

182.    The press release quoted Michael Callen, Ambac's CEO after Genader's resignation, stating that "[w]e view the current perceptions of Ambac's business by both the market and ratings agencies as underestimating Ambac's strengths and future potential" and that "we believe that Ambac can realize new business opportunities in our core markets and through reinsurance while we strengthen our capital position further to maintain our triple-A ratings under S&P and Moody's and seek to regain it under Fitch." The press release also stated that "management remains confident that Ambac's capital

position and claims paying ability remain strong.  Management is equally confident in Ambac's insured portfolio and the Company's ability to support policyholder liabilities."

183.   The press release disclosed that Ambac's Active Credit Reserves "increased by $196.7 million during the quarter, from $166.7 million at September 30, 2007 to $363.4 million at December 31, 2007," and that "[t]he increase was driven by unfavorable credit activity within the home equity line of credit and closed-end second lien RMBS portfolio, partially offset by favorable credit activity within the public finance portfolio."

184.   During Ambac's conference call that day, Callen further stated that "[t]he loss estimates incorporated into Ambac's stock price today and loss assumptions supporting various models cited in the market are very disparate and drastic; and personally, I cannot find the logic underlying these assumptions."   Also, Leonard continued to assure the market that: "***Ambac continues to believe that the balance of the mark-to-market losses taken to date are not predictive of future claims, and that in the absence of further credit impairment, that the cumulative marks would be expected to reverse over the remaining life of the insured transactions.***"   In response to an analyst question, Leonard also stated that Ambac had "obviously analyzed the portfolio very thoroughly" and that "while we do have some impairment and that has been a confidence type issue, we are confident in what we have done."

185.   The above statements were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.   Contrary to Callen's statements that the current market perceptions were "underestimating Ambac's strengths and future potential" and that Ambac could

"strengthen our capital position further to maintain our triple-A ratings," in fact, Ambac was in a precarious financial position.  The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures.  Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS-backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly.

        b.     Callen's critique of the "loss assumptions" supporting various models cited in the market hid the breadth of the actual deterioration of the collateral supporting Ambac's RMBS-exposures and CDOs backed by RMBS.

        c.     The reported write-down in fact was drastically lower than an appropriate write-down based upon the actual performance of Ambac's CDO exposure at that time, which would have reflected underlying collateral deterioration.  Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time.

## C.    Ambac's 2007 Form 10-K

186.    On February 29, 2008, Ambac filed with the SEC its Form 10-K for the year ended December 31, 2007 (the "2007 Form 10-K").  The 2007 Form 10-K was signed by Leonard and included as exhibits Sarbanes-Oxley Certifications signed by Leonard.  This Certification made the identical representations set forth at ¶ 104, *supra*.  The 2007 Form 10-K also contained the same representation that the Consolidated Financial Statement were prepared in accordance with GAAP as in the 2006 Form 10-K.

187.    The 2007 Form 10-K reported the same reserves, mark-to-market adjustments, credit impairment, net earnings and net earnings per share, as reported in the January 22, 2008 press release, as set forth in ¶ 181, *supra*.

188.    The above statements were false and misleading because Defendants misrepresented and/or failed to disclose that:

a.    The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures. Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS-backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly.

b.    After mortgage originators lowered their underwriting standards, Ambac lowered its own underwriting standards to allow it to accept greater risk characteristics in RMBS exposures and in CDOs backed by RMBS.

c.    As a result of Ambac's lower underwriting standards, the collateral supporting Ambac's RMBS-exposures and CDOs backed by RMBS showed severely negative trends in delinquencies and other key metrics.

d.    The reported write-down in fact was drastically lower than an appropriate write-down based upon the actual performance of Ambac's CDO portfolio at that time, which would have reflected underlying collateral deterioration.  Ambac's mark-to-market and likely credit losses were much higher than the losses it had reported at this time.

e.      Ambac's financial statements for the year ended December 31, 2007 violated GAAP by materially misstating Ambac's assets and liabilities, net income and income per share, based on the failure to properly mark-to-market the true value of its CDS-related exposures, and to record sufficient reserves on its direct RMBS exposures.  Instead of reporting a loss of $3.24 billion, Ambac should have reported a loss of $10.45 billion for the year 2007.

**D.      The March 14, 2008 Chairman's Letter**

189.      On March 14, 2008, Ambac issued a letter by Michael Callen to Ambac's "policyholders, clients, shareholders and friends."  The letter represented that:

> Ambac has over $15 billion of claims-paying resources, sufficient to meet Moody's and S&P's criteria to retain a triple-A rating.  Additionally, our capital base will build further as other judicious capital strengthening actions are implemented.

190.      The letter also asserted that:

> *--Loss projections that you read and hear about are simply that - projections. They are based on limited data and the numbers that get the headlines are stress case losses, not expected losses*.  We remain confident that Ambac will weather the storm.  With over $15 billion in claims-paying resources behind all we do, no investor in an Ambac-insured security should worry that they will miss a principal or interest payment.
>
> *--Ambac never considered a "bailout." Bailouts are for firms that are facing insolvency . . . .*
>
> *--Lost amidst all the noise and market volatility is the simple fact that most of Ambac's insurance portfolio is performing strongly.  The issues in Ambac's portfolio arise largely from four transactions, the "CDO-squareds," that account for the vast majority of our potential losses.*  (Emphasis added.)

191.      These statements were materially false and misleading because Defendants misrepresented and/or failed to disclose that:

a.    Contrary to Callen's statements that Ambac had sufficient claims-paying resources "sufficient to retain a triple-A rating" and that Ambac was not facing "insolvency," Ambac in fact was in a precarious financial position. The reserves and impairment charges that Ambac took were materially deficient in relation to the size of Ambac's RMBS and CDO exposures.  Ambac's total reserves were only approximately 1% of Ambac's overall RMBS exposure, and Ambac's $1.1 billion impairment charge represented less than 4% of Ambac's $29+ billion exposure to RMBS-backed CDOs – at a time when the underlying collateral performance continued to deteriorate rapidly.

b.    Ambac's insurance portfolio was not "performing strongly" and the "issues" were not confined to four CDOs.  As Ambac later conceded on its April 23, 2008 conference call and thereafter, the "issues" spilled over to numerous closed-end seconds and HELOC transactions – on which Ambac began incurring substantial reserves – as well as Ambac's "high-grade" CDOs backed by RMBS.

## AMBAC'S FINANCIAL STATEMENTS VIOLATED GAAP

192.    Defendants made numerous untrue statements of material fact and omitted to state material facts necessary to make Ambac's reported financial results not misleading.  Defendants caused the Company to falsely report its position and results of operations for the year ended December 31, 2006 and December 31, 2007, and interim financial statements for the quarterly periods ended March 30, 2007, June 30, 2007, September 30, 2007, March 30, 2008, and June 30, 2008, by, among other things, overstating assets and net earnings, understating liabilities, failing to disclose negative trends, failing to fairly mark-to-market the value of its CDS on CDOs, and failing to take required loss reserves on its direct RMBS exposures.

193.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB").  SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC which are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  SEC Regulation S-X, 17 C.F.R. §210.10-01(a)(5), also requires that interim financial statements comply with GAAP and "shall include disclosures either on the face of the financial statements or in accompanying footnotes sufficient so as to make the interim information presented not misleading."

194.    GAAP consists of a hierarchy of authoritative literature.  The highest priority is comprised of FASB Statements of Financial Accounting Standards ("SFAS").  Other sources to be used for financial reporting include FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB"), and AICPA Auditing Standards ("AU") and Statements of Position ("SOP").  GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON"), which provide a framework for the standard process for reporting transactions that are not specifically addressed by an existing accounting standard.

195.    The responsibility for preparing the financial statements in conformity with GAAP rests with the company's management, as, for example, set forth in AU 110:03:

> The financial statements are management's responsibility  .  .  .  .
> Management is responsible for adopting sound accounting policies and for

establishing and maintaining internal controls that will, among other things, initiate, authorize, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management . . . . ***Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***. (Footnote omitted, Emphasis added.)

196.    As set forth herein, Ambac's relevant financial statements presented the Company's financial position and results of operations in a manner which, among other things, also violated the following accounting concepts, requiring that a Company's financial reporting provide information:

a.    that is useful to present to potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON 1 ¶ 34);

b.    about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASCON 1 ¶ 40);

c.    that represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASCON 2 ¶¶ 58-59);

d.    that is complete, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2 ¶ 79);

e.    is verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASCON 2 ¶ 81); and

      f.     the principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risk inherent in business situations are adequately considered. (FASCON 2 ¶¶ 95, 97).

197.    Financial guarantees on the various RMBS and CDOs directly insured by Ambac are accounted for differently under GAAP than credit default swap derivatives. CDS transactions are considered to be credit derivatives, and are accounted for at fair value and require changes in fair value to be recognized currently in earnings under SFAS 133, *Accounting for Derivative Instruments and Hedging Activities*, and SFAS 107, *Disclosures About Fair Value of Financial Instruments*, with additional guidance from FIN 45*, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others*.  Direct financial guarantees on RMBS and CDOs are recognized as insurance contracts under SFAS 60, *Accounting and Reporting by Insurance Enterprises*, and are largely accounted for as loss contingencies under SFAS 5, *Accounting for Contingencies*.  FASB Statement of Position ("SOP") 946, *Disclosure of Certain Significant Risks and Uncertainties*, FASB Staff Position ("FSB") SOP 94-6-1, as discussed below in ¶¶ 230-236, augment both SFAS 60 and SFAS 5 accounting requirements.

198.    As explained herein, Ambac failed to properly account for the Company's derivative exposure to CDS by failing to properly mark their fair value to the market, in clear violation of SFAS 133.  Additionally, Ambac failed to make adequate loss reserve disclosures for its billions of dollars of direct RMBS and CDO exposure.

**Ambac Violated SEC Item 303 By Failing To Disclose Negative Trends**

199.   Item 303 of Regulation S-K, *Management's Discussion and Analysis (MD&A) of Financial Condition and Results of Operations*, specifically requires MD&A disclosures regarding Ambac's liquidity, capital resources, results of operations and contractual obligations, among other things.   Regulation S-K, Item 303(a) requires the identification of "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way;" "any known material trends, favorable or unfavorable, in the registrant's capital resources;" and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operation."

200.   Ambac was required by Item 303, from the fourth quarter of 2006 forward, to, *at the very least*, disclose how and why the known trends in the housing market and interest rate environment created serious risk to Ambac's financial condition. As set forth herein, Defendants: (a) knew but did not disclose that the underwriting standards of the mortgage originators whose loans comprised the collateral for Ambac's RMBS had weakened precipitously by mid-2006; (b) secretly changed Ambac's own direct RMBS underwriting guidelines to abandon a loan-by-loan analysis of mortgage pools included in its RMBS, thus allowing the Company to guarantee the riskier mortgage loans passing through the originators' weakened standards; and (c) failed to properly acknowledge or account for the impact of the declining housing market, rising

interest rates, and observed reference collateral deterioration on Ambac's direct RMBS and CDOs, and on Ambac's credit default swaps against CDOs of RMBS.

201.   These trends were reasonably likely to have a pronounced effect on the value of Ambac's direct RMBS and CDOs backed in part by RMBS.  Accordingly, Item 303 required, *at the very least*, disclosure by Ambac of the "known trends" affecting its exposure to the housing market, its capital cushion, and its financial position generally.

## Ambac Violated SFAS 133 And SFAS 107 By Failing To Mark Its CDO Exposures To Market

202.   As described herein, Ambac violated SFAS 133 by failing to mark its CDS of CDO exposure in a manner reflecting the actual performance and declining market value of those securities.  Ambac's "proprietary model" produced values divorced from the prevailing market indices – in this case, the ABX and TABX indices.  By ignoring both actual market prices and the relevant market indices in favor of an undisclosed proprietary model that bore no resemblance to either the prevailing market prices or market indices, Ambac's mark-to-market valuations were false, misleading, and in violation of GAAP, SFAS 133, SFAS 107 and FIN 45.

203.   In order to meet the peculiar financial reporting and capital management needs of Wall Street investment banks, when Ambac insured CDOs backed largely by residential mortgage securities, it did so primarily by writing complex derivative contracts rather than employing its historical practice of writing true insurance contracts. According to its 2007 Form 10-K:

> Ambac's exposure to derivative instruments is created through interest rate, currency, total return and credit default swaps.  These contracts are accounted for at fair value under SFAS 133 "Accounting for Derivative Instruments and Certain Hedging Activities," as amended ("SFAS 133").

204.    The cornerstone of SFAS 133 is that it "requires that an entity recognize all derivatives as either assets or liabilities in the statement of financial position and measure those instruments *at fair value*."  *See* SFAS 133, Summary (Emphasis added.) SFAS 133 was intended to give investors and analysts much greater clarity about the use of derivatives and the effectiveness (and ineffectiveness) of a company's hedging activities, which are governed by SFAS 60 and 5, as discussed below.

205.    CDS are classified as "Derivative Liabilities" on Ambac's balance sheet. CDS are typically considered derivative contracts because they "derive" their value from underlying assets, including, of particular import in this case, RMBS.  The price of a swap is set by the expected likelihood of a default and the probable amount of the loss, or the "loss severity."  The "value" of the swap is the difference between the premiums the issuer/seller will receive and the likely default payments it will make.  As the amount of the anticipated default payments increases, the value of the swap decreases.  Basically, as asset-backed security prices (including CDOs) rise or fall, CDS prices will conversely fall or rise in the opposite direction.

206.    Therefore, if Ambac issued a CDS at a time when market spreads on the underlying reference collateral – the CDO at issue – were high, but subsequent events made the market take a more optimistic view of the CDO's performance, narrowing the credit spreads, Ambac was able to book income statement gains from this spread movement.  In effect, the insurance it was offering would be "wasted" if the underlying CDO proved healthier than expected when the counterparty purchased the insurance.  On the other hand, if the expected performance of the CDO deteriorated after Ambac wrote

its CDS against it, then Ambac was required by SFAS 133 to take write-downs based on the increased chance it would have to perform on its obligation.

207.    Mark-to-market gains and losses are recognized on Ambac's financial statements in an account called "Net Mark-to-Market (Losses) Gains on Credit Derivative Contracts," which represents the portion of mark-to-market gains/losses directly related to credit derivatives.

208.    SFAS 107, as amended by SFAS 133, requires a company to "disclose, either in the body of the financial statements or in the accompanying notes, the fair value of financial instruments for which it is practicable to estimate that value."

209.    Both SFAS 107 and SFAS 133 contained similar market-driven definitions of fair value before being subsumed by SFAS 157, *Fair Value Measurements*, a Statement issued in September 2006 (although not mandatorily adopted until November 2007), that defined fair value and provided a standardized framework for determining fair value as follows:

> *[F]air value is a market-based measurement, not an entity-specific measurement*.  Therefore, a fair value measurement should be determined based on the assumptions that market participants would use in pricing the asset or liability.  (Emphasis added.)

210.    In addition to the requirements of SFAS 107 and 133, Ambac was required to make disclosures in accordance with FIN 45 with regard to its SFAS 133 derivative portfolio.  FIN 45 elaborates on the disclosures to be made by a guarantor in its interim and annual financial statements about its obligations under certain guarantees that it has issued.  It also clarifies that a guarantor is required to recognize, at the inception of a guarantee, a liability for the fair value of the obligation undertaken in issuing the guarantee.  Even "if the likelihood of the guarantor's having to make any payments under

the guarantee is remote," FIN 45, ¶ 13 specifically required Ambac to disclose, among other things, "[t]he nature of the guarantee, including the approximate terms of the guarantee, how the guarantee arose, and the events and circumstances that would require the guarantor to perform under the guarantee." FIN 45 also required disclosure of:

     a.    The current carrying amount of the liability, if any, for the guarantor's obligation obligations under the guarantee (including the amount, if any, recognized under paragraph 8 of Statement 5), regardless of whether the guarantee is freestanding or embedded in another contract; and

     b.    The nature of (1) any recourse provisions that would enable the guarantor to recover from third parties any of the amounts paid under the guarantee and (2) any assets held either as collateral by third parties that, upon the occurrence of any triggering event or condition under the guarantee, the guarantor can obtain and liquidate to recover all or a portion of the amounts paid under the guarantee. The guarantor shall indicate, if estimable, the approximate extent to which the proceeds from liquidation of those assets would be expected to cover the maximum potential amount of future payments under the guarantee.

211.    These rules for establishing fair value are clear. First, use market prices when available. If no market prices are available, use the best available proxy for the way market participants would price the asset or liability, as the case may be. As set forth below, Ambac failed to comply with GAAP in determining fair value.

212.    Throughout the Class Period, Ambac failed to comply with SFAS 133, SFAS 107, and FIN 45, because it disregarded the governing relationship between fair value and direct or strongly indicative existing market valuations by refusing to mark its

billions of dollars of CDS exposure in relationship with the pertinent market indicator – the TABX – or even to provide an estimate of its CDS fair value losses, as secondarily required by SFAS 133.

213.    According to its 2007 Form 10-K, Ambac's fair value amounts represent "the net present value of the difference between the fees Ambac originally charged for the credit protection and our estimate of the fees that a comparable financial guarantor may charge for the same protection at the balance sheet date."  In order to determine the current pricing of a CDS on the same underlying security, Ambac used a proprietary model.   Investors were forced to accept the validity of Ambac's "mark-to-model" reporting because of the lack of transparency into these proprietary models.  Defendants justified use of Ambac's proprietary model through their insistence that Ambac's CDO instruments were of higher quality than the market, and as having little relation to perceived market fluctuations.

214.    The collateral performance of the relevant ABX and TABX indices were so similar to Ambac's underlying CDO collateral that they were more than adequate market proxies.   In fact, the underlying collateral of Ambac's representative CDOs moved in tandem with the ABX and TABX underlying collateral.  Yet Ambac repeatedly and falsely stated that its CDOs performed better than the ABX and TABX indices, and therefore avoided reporting reliable mark-to-market losses in relation to the declines in the TABX for similarly senior CDS instruments.

215.    In fact, using the collateral comprising the most senior attachment point in the TABX as a reference point, Ambac should have written down $2.068 billion of its exposure in the first quarter of 2007, $2.716 billion in the second quarter, $8.923 billion

by the third quarter, and $3.6 billion for the fourth quarter.  Ambac's reported mark-to-market write-downs were $5.1 million in Q1, $56.8 million in Q2, $743 million in Q3, and $5.4 billion in Q4 or a total of approximately $6.204 billion for the entire year. Ambac should have taken mark-to-market write-downs of $17.3 billion for the year-ended December 31, 2007.

216.    Ironically, the problem with Ambac's reporting was only discovered because Wall Street investment banks holding similar exposures began to report their own massive write-downs in the fall of 2007.

217.    As of the end of the third quarter of 2007, Ambac's exposure to CDO of ABS, including CDO-squared, was $29.2 billion.  Thus, the $743 million mark-to-market adjustment announced on October 10, 2007 represented just 2.5% of Ambac's exposure to CDO of ABS.  Isolating the $529 million of this write-down that Ambac attributed to its portfolio of CDOs based on ABS, the total charge represented just 1.8% of the total exposure.  This percentage write-down is ***vastly smaller*** than what other holders of similar securities were taking at the same time period.

218.    Ambac likewise had significant deterioration in its CDS exposure.  An example of the deterioration in Ambac's CDS exposure on CDS occurred when Ambac announced on August 1, 2008, that it was transferring the liability of a CDS with a notional value of $1.4 billion back to Citigroup, the counterparty.  Citigroup required that, in addition to canceling any future premiums and payments to Ambac, Ambac had to pay Citigroup an additional $850 million.  This payment was likely based, in part, on the current deterioration of the value of the referenced assets in the CDS and the risk that Ambac did not have sufficient capital to make good on the CDS.

219.    Moreover, on July 28, 2008, Merrill Lynch announced that it would sell Super Senior CDO of RMBS with a par value of $30.6 billion for only $6.7 billion. Merrill Lynch had previously written-down the value of the Super Senior CDO of RMBS to approximately $11.1 billion based on the deterioration of the CDO.

220.    Ambac's mark-to-market methodology would ignore that the CDS with Citigroup or the CDO sold by Merrill Lynch had declined in value.  In fact, Ambac's mark-to-market methodology assumes that the current value of the CDO remains at par. This is simply not a proper mark-to-market and violates GAAP.

221.    Ambac's method of valuing its CDS obligations to market also creates a perverse incentive: the less the Company charges relative to then-current market spreads place, the less downside risk it bears if the reference collateral deteriorates. GAAP requires a more reasonable relationship between marks and observed market pricing.  ***In the third quarter of 2007, Ambac wrote no CDS against CDOs***.  It could not show that it or any market participant was willing to write credit default swaps against its CDO exposures for pricing consistent with Ambac's valuation methods.  Ambac's assumption that a market participant would purchase its pre-existing CDS obligations by reference to the price Ambac charged at issuance was in violation of SFAS 133 and 107.

**Ambac Violated SFAS 5 By Failing To Take Adequate Loss Reserves**

222.    In contrast to Ambac's CDS valuations, Ambac's direct RMBS and RMBS-backed non-derivative CDO portfolios are written as conventional insurance contracts and, therefore, have to be reported in conformity with GAAP's financial guarantee accounting methodology, primarily SFAS 60 and 5.  Ambac employs two

separate loss reserves in its financial statements: "case basis" reserves and "active credit reserves" ("ACR").

223.    Case basis reserves are taken when a particular credit has already incurred some event of default.  SFAS 60, *"Accounting and Reporting by Insurance Enterprises*," provides guidance for the premium and claims cost recognition for insurance companies, including Ambac's case loss reserves.  Under SFAS 60, ¶ 17, Ambac was required to increase its "case basis" loss reserves when insured events occur, such as a triggering event or event of default.

224.    ACR's, on the other hand, are reserves taken when the credit quality of certain insured assets deteriorates.  SFAS 5, *"Accounting for Contingencies*," governs the accounting and reporting for loss contingencies before the actual event of default or other triggering event occurs.   Under SFAS 5, a contingency is "an existing condition, situation, or set of circumstances involving uncertainty as to [a] possible . . . loss (hereinafter, a "loss contingency") to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur."  SFAS 5, ¶ 1.

225.    Ambac's reserves policy is based on guidance provided by SFAS 5.  As explained in Ambac's 2007 Form 10-K:

> Ambac establishes an active credit reserve to reflect the probable and estimable losses due to credit deterioration on insured credits that have not yet defaulted or been reported as of the reporting date.  The active credit reserve is established through a process that estimates probable losses inherent in the **adversely classified credit** portfolio.  (Emphasis added.)

226.    Pursuant to Paragraph 8 of SFAS 5, Ambac is required to accrue for a loss contingency, with an equal and corresponding charge to income, when it is both ***probable that an asset has been impaired*** or a liability incurred at the date of the financial statements and that the ***amount of loss can be reasonably estimated***.

227.    Critically, even when a contingency does not meet both the "probable" and "reasonably estimable" prongs, the FASB requires the disclosure of contingencies and losses under circumstances directly applicable to Ambac in SFAS 5, ¶ 10.   In addition to the fundamental principles of financial reporting established by the principles and FASCONs stated above, GAAP requires certain disclosures (even without any accompanying quantitative estimates).

> If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is *at least a reasonable possibility that a loss or an additional loss may have been incurred.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made* . . . . (Emphasis added.)

228.    The above language makes clear that the disclosure of a contingency shall be made whenever it is "reasonably possible" (as opposed to probable) that a loss may have been incurred, even if the loss cannot be reasonably estimated under SFAS 5, ¶ 8. SFAS 5 defines "reasonably possible" as "[t]he chance that the future event or events will occur is *more than remote but less than likely*." SFAS 5, ¶ 3(b) (Emphasis added.) Regardless of whether a loss is "less than probable" or if the loss cannot be estimated, disclosure of a loss contingency is still required by GAAP.

229.    From the fourth quarter of 2006 through the third quarter 2007, Ambac's loss reserves covered only 0.5% of its total RMBS exposure, excluding coverage of Ambac's CDO, CDS, municipal, public and other exposures, which would bring reserve coverage to only 0.04% of its net exposure.   Given the weak and deteriorating characteristics of Ambac's 2006 and 2007 RMBS exposure – as first publicly admitted by Ambac on April 23, 2008 – Ambac's failure to: (a) provide an estimate of the Company's

probable losses, or, at the very least (b) disclose that a contingent loss is reasonably possible along with a range of losses or an explanation why such range could not be estimated, violated SFAS 5.

### Ambac Ignored The FASB Reminder To The Market To Account For The Growing Risk Of Exposure Associated With Mortgage-Related Exposure

230.    In December 2005, the governing body of accountants issued a reminder to companies like Ambac to account for and disclose mortgage-related exposure, entitled FASB's Statement of Position "SOP" 94-6-1, "Terms of Loan Products That May Give Rise To A Concentration of Credit Risk."

231.    SOP 94-6, the Statement upon which the reminder was based, requires the disclosure of certain significant risks and uncertainties, including information about (a) the nature of a company's operations, (b) the company's use of significant estimates in the preparation of financial statements, and (c) current vulnerability to certain concentrations. SOP 94-6, ¶ 8.   These requirements are in addition to the disclosure requirements of SFAS 5, as noted in SOP 94-6, ¶ 12:

> In addition to the disclosures required by FASB Statement No. 5 and other accounting pronouncements, this SOP requires disclosures regarding estimates used in the determination of the carrying amounts of assets and liabilities or in disclosures of gain or loss contingencies . . . .

232.    Under SOP 94-6, ¶ 12, Ambac was required to disclose the nature of an estimate and indicate that: (a) it is at least reasonably possible that the estimate will change in the near term, and (b) the effect of the change would be material to the financial statements.   SOP 94-6, ¶ 17 informs accountants: "this SOP does not depend on the amount that has been reported on the financial statements, but rather the materiality of the effect that using a different estimate would have had on the financial statements." This pronouncement therefore placed a responsibility on Ambac to disclose any factors

that might change in the near term which would have materially impacted amounts reported in the financial statements.

233.    As the credit markets worsened through 2006 and into the beginning of 2007, it became more apparent that it was at least "reasonably possible" (*i.e.*, more than remote, but less than likely) that Ambac might be vulnerable to the liabilities regarding many of its direct RMBS and derivative CDS exposures.  On or about December 19, 2005, the FASB and its staff issued its FASB SOP 94-6-1, an unusual reminder specifically warning Ambac and other companies heavily involved in subprime that several of the loan products the Company guaranteed could result in increased defaults and losses.

234.    In April 2008, FASB Chairman Robert Herz called the subprime-type financial vehicles "ticking time bombs."  At the time, the FASB staff noted that it had drafted and released FASB SOP 94-6-1 "to emphasize the need for financial statement preparers to consider whether they had disclosed enough information about the risks involved in such loans, and whether changes in market conditions required additional disclosure."  Additionally, the FASB emphasized the need to reconsider disclosures in the face of changing market conditions to determine if additional disclosure was required. According to a May 1, 2008 article entitled "FASB on Subprime: 'We Warned You,'" "[FSP SOP 94-6-1] strongly suggested that additional disclosure was required – by a variety of accounting standards – for many of the subprime scenarios it described."

235.    On February 29, 2008, in its 2007 Form 10-K, Ambac disclosed, under the heading "Residential Mortgage-Backed Securities Exposure":

> The risk of loss inherent in the 2005, 2006 and 2007 vintage sub-prime, mid-prime and second lien mortgage loans has been elevated due to a

number of factors.   These factors increase current and potential future losses and include but are not limited to the following:

There has been a notable increase in mortgage loan delinquencies and foreclosures and this situation resulted in significant losses for mortgage lenders and investors in mortgage related products.

* * * *

The very unfavorable residential mortgage market in the United States has been marked by nationally declining home prices.  As home prices fall, the value of collateral available to pay loan balances is diminished, which will cause significantly higher loss severities in the event a borrower defaults.

Ambac insures tranches issued in RMBS, including transactions that contain risks to the above types of mortgages and risk classifications.

236.   But Ambac's February 29, 2008 disclosure of the risks in its insured exposures came too late; participants in the structured finance markets, such as Defendants, had ample warning that these problems were on the horizon no later than the end of 2006, long before the Company issued its Form 10-K for the year ended December 31, 2007.   Not only did the FASB, among others, sound these warnings loudly and clearly via FASB SOP 94-6-1, in which it specifically warned of the two major causes of the current subprime debacle, "affordability products" and a decline in the housing markets, but Defendants were aware, or were reckless in not being aware of the negative trends in the market through Ambac's purported surveillance of its RMBS-related portfolio.

## LOSS CAUSATION

237.   Defendants' unlawful conduct alleged herein directly caused the losses incurred by Plaintiffs and the Class.   Throughout the Class Period, the price of STRATS securities was artificially inflated as a direct result of Defendants' false and misleading statements and omissions.   The false and misleading statements set forth above were widely disseminated to the securities markets, investment analysts and the investing

public.   The Company's true condition became known by investors and the market through a series of partial corrective disclosures.   By making contemporaneous misstatements, the Company and its management mitigated the impact of those corrective discloses and prevented the full truth about Ambac from being revealed at once.

238.    When the true facts became known and/or the materialization of the risks that had been fraudulently concealed by Defendants occurred, the price of STRATS securities declined precipitously as the artificial inflation was removed from the market price of these securities, causing substantial damage to Plaintiffs and the members of the Class.    Examples of specific dates of adverse disclosures regarding Ambac and corresponding declines in the price of STRATS securities are set forth below.

**Ambac's January 16, 2008 Disclosures**

239.    On January 16, 2008, Ambac announced a staggering $5.4 billion in mark-to-market write-downs, including over $1 billion of credit impairments on its credit default swap CDO exposures, and $143 million in loss reserves in its direct insurance RMBS exposure.   Ambac also announced that its CEO, Genader, was resigning, effective immediately and that it was cutting its dividend by 67% in order to preserve capital.

240.    On this announcement, STRATS trading price plummeted 56% on the news, from a closing price of $20.35 on January 15, 2008, to a closing price of $8.95 on January 18, 2008.   These announcements caught Wall Street by surprise and several analysts downgraded Ambac stock in light of the stunning losses.

241.    On January 18, 2008, following Ambac's abandonment of its capital-raising plan, Ambac became the first bond insurer to lose its AAA rating when Fitch downgraded the company.

**Ambac's April 23, 2008 Disclosure**

242.    On April 23, 2008, as Ambac announced a net loss of $1.66 billion, driven primarily by an impairment of $1.045 billion of HELOC and CES deals, and by a further mark-to-market loss of $1.725 billion on Ambac's CDS exposures.

243.    Once again, this announcement caught the market by surprise and STRATS trading price plunged 25.83 % on the news, from a closing price of $11.42 on April 22, 2008, to a closing price of $8.47 on April 25, 2008.

244.    The price declines directly and proximately resulting from the above discussed disclosures were not caused by industry news, randomness, or by Ambac related information unrelated to the alleged fraud.    Each of the above referenced disclosures partially corrected the false and misleading information previously available to the market by Defendants' wrongful course of conduct.

## THE STATUTORY SAFE HARBOR DOES NOT APPLY

245.    As alleged herein, Defendants acted with scienter in that they: (a) knew, at the time that they were released, that the public documents and statements issued or disseminated in the name of Ambac were materially false and misleading or omitted material facts; (b) knew that such statements or documents would be issued or disseminated to the investing public; (c) knew that investors were likely to reasonably rely on those misrepresentations and omissions; and (d) knowingly and substantially participated, or were involved in, the issuance or dissemination of such statements or documents as primary violations of the federal securities law.

246.    As set forth elsewhere herein, Defendants were informed of, participated in and knew of the fraudulent scheme alleged herein, by virtue of their: (a) receipt of

information reflecting the true facts regarding Ambac; (b) control over, and/or receipt of Ambac's allegedly materially misleading misstatements; and (c) access to confidential proprietary information concerning Ambac.   With respect to non-forward-looking statements and/or omissions, Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

247.    Defendants' false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor.   The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made.  No statutory safe harbor applies to any of Defendants' materially false or misleading statements.

248.    Alternatively, to the extent that any statutory safe harbor is intended to apply to any "forward-looking" statement pled herein, Defendants are liable for false forward-looking statements because, at the time each forward-looking statement was made, the speaker knew or had actual knowledge that the forward-looking statement was materially false or misleading, and the forward-looking statement was authorized and/or approved by a director and/or executive officer of Ambac who knew that the forward-looking statement was false or misleading.   Neither of the historic or present tense statements made by Defendants were an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by

Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

249.    In addition, to the extent any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the Company's underwriting, surveillance and accounting practices, and its purported compliance with GAAP.

### **RELIANCE – FRAUD ON THE MARKET**

250.    At all relevant times, the market for STRATS was an efficient market for the following reasons, among others:

a.      STRATS were actively traded on the New York Stock Exchange under the ticker symbol "GJW", a highly efficient market;

b.      As a regulated issuer of securities, Defendant filed periodic public reports with the SEC;

c.      Ambac was followed by numerous securities analysts, who issued a significant number of reports on Ambac during the Class Period; and

d.      Ambac communicated with public investors via established market communication mechanisms, including the regular issuance of press releases through the Business Wire news service, and conference calls with analysts and investors.

251.    As a result, the market for STRATS promptly digested current information with respect to Ambac from all publicly available sources and reflected such information

in the price of STRATS.  Under these circumstances, all purchasers of STRATS during the Class Period suffered similar injury through their purchase of the publicly traded securities at artificially inflated prices, and a presumption of reliance applies.

## COUNT I

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder

### (Against all Defendants)

252.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

253.   This Count is asserted by Plaintiffs on behalf of themselves and the Class against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

254.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Ambac's securities, including the Ambac DISCS securities underlying the STRATS; and (c) cause Plaintiffs and other members of the Class to purchase or otherwise acquire STRATS securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

255.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading by use of means or instrumentalities of interstate commerce; and (c) engaged in acts, practices, and a course of business which operated as

a fraud and deceit upon the purchasers and acquirers of the Company's securities in an effort to maintain artificially high market prices for Ambac's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

256.    As a result of Defendants' making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.    Defendants' material misrepresentations and omissions as set forth herein violated that duty.

257.    Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the Class.  Defendants knowingly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

258.    As a result of Defendants' fraudulent activity, the market price of Ambac DISCS securities, and therefore STRATS securities, was artificially inflated during the Class Period.

259.    In ignorance of the true financial condition of Ambac, Plaintiffs and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Ambac containing the misleading information, purchased or otherwise acquired STRATS securities at artificially inflated prices during the Class Period.

260.    The market price of Ambac's DISCS securities, as well as, STRATS securities, materially declined upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

261.    Plaintiffs' (and the Class') losses were proximately caused by Defendants' active and primary participation in Ambac's scheme to defraud the investing public by, among other things, falsifying the Company's finances and operations. Plaintiffs (and the members of the Class) purchased STRATS securities in reliance on the integrity of the market price of those securities, and Defendants manipulated the price of Ambac DISCS securities and thereby the STRATS securities through their misconduct as described herein. Furthermore, Defendants' misconduct proximately caused Plaintiffs' (and the Class') losses. Plaintiffs' (and the Class') losses were a direct and foreseeable consequence of Defendants' failure to disclose and their concealment of, *inter alia*, the true state of the business operations and financial condition of Ambac.

262.    Throughout the Class Period, Defendants were aware of material non-public information concerning Ambac's fraudulent conduct (including the false and misleading accounting statements). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information regarding Ambac's falsified revenue figures, and Plaintiffs' (and the Class') losses were the foreseeable consequence of Defendants' concealment of this information.

263.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of STRATS during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act

### (Against the Individual Defendants)

264.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

265.    As alleged herein, the Individual Defendants acted as controlling persons of Ambac within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a). By virtue of their executive positions, and/or Board membership, as alleged above, these individuals had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

266.    In particular, the Individual Defendants had direct involvement in the day-to-day operations of the Company and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

267.    As set forth above, the Individual Defendants and Ambac committed a primary violation of Section 10(b) and Rule 10b-5 of the Exchange Act by the acts and omissions alleged in this Complaint.  By virtue of their positions as controlling persons of

Ambac, the Individual Defendants are therefore liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of STRATS during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action;

B.     Awarding compensatory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims set forth herein.

Dated: January 20, 2009

**GARDY & NOTIS, LLP**

By: _____
          Mark C. Gardy
          James S. Notis
440 Sylvan Avenue, Suite 110
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

*Counsel for Plaintiffs*

**CERTIFICATION OF PROPOSED LEAD PLAINTIFF
PURSUANT TO THE FEDERAL SECURITIES LAWS**

I, Stanley Tolin, certify that:

1.      I have reviewed the amended complaint and authorized its filing.

2.      I did not purchase the security that is the subject of this action (Structured Repackaged Asset-Backed Trust Securities, Callable Class A Certificates, Series 2007-1, STRATS(SM) Trust for Ambac Trust Ambac Financial Group, Inc. Securities, Series 2007-1 ("STRATS") (NYSE: GJW)) at the direction of plaintiff's counsel, or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

**Purchases:**

| Date | Shares Bought | Price Per Share |
|------|---------------|-----------------|
| 1/11/08 | 1,500 | $19.00 |

**Sales (if any):**

| Date | Shares Sold | Price Per Share |
|------|-------------|-----------------|
|      |             |                 |

5.      I have sought to serve as a representative party on behalf of a class in Tolin v. Fuld, Jr., et al., Case No. 1:08-cv-10008-UA.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Signed: _____

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Edward Walton, certify that:

1.      I have reviewed the amended complaint and authorized its filing.

2.      I did not purchase the security that is the subject of this action (Structured Repackaged Asset-Backed Trust Securities, Callable Class A Certificates, Series 2007-1, STRATS(SM) Trust for Ambac Trust Ambac Financial Group, Inc. Securities, Series 2007-1 ("STRATS") (NYSE: GJW)) at the direction of plaintiff's counsel, or in order to participate in any private action arising under this title.

3.      I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.      My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

**Purchases:**

| **Date** | **Shares Bought** | **Price Per Share** |
|---|---|---|
| 6/29/07 | 1,000 | $25.00 |

**Sales (if any):**

| **Date** | **Shares Sold** | **Price Per Share** |
|---|---|---|

5.      I have not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6.      I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Signed: _Edward B Walton_

1/13/09

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was sent by First Class Mail to defendants as follows:

      Ambac Financial Group, Inc.
      Robert J. Genader
      Sean T. Leonard
      c/o Peter C. Hein
      Warren R. Stern
      Joshua A. Naftalis
      C. Lee Wilson
      **WACHTELL, LIPTON, ROSEN & KATZ**
      51 West 52nd Street
      New York, New York 10019

                      James S. Notis
                      **GARDY & NOTIS, LLP**
                      440 Sylvan Avenue, Suite 110
                      Englewood Cliffs, New Jersey 07632
                      Tel: 201-567-7377
                      Fax: 201-567-7337