UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

STANLEY TOLIN and EDWARD
WALTON, individually and on behalf of all
others similarly situated,

              Plaintiffs,

    -against-

AMBAC FINANCIAL GROUP, INC.,
ROBERT J. GENADER and SEAN T. LEONARD,

        Defendants.

———————————————————————— x

08 Civ. 11241 (CM)

```
┌─────────────────────────────┐
│ USDS SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____              │
│ DATE FILED: 12/23/09        │
└─────────────────────────────┘
```

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

McMahon, J.:

This action raises what appears to be a question of first impression in this Circuit: does the Second Circuit's decision in Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks Corp., 369 F.3d 27 (2d Cir. 2004) (hereinafter "Nortel") bar the purchasers of a derivative securities product from bringing a 10(b)(5) action against the issuer of the securities that were bundled by a second issuer to create the derivative?

I conclude that it does not, at least not on the facts of this case.

Because defendants' other challenges to the face of the complaint are unpersuasive (and, for the most part, premature), their motion to dismiss is denied.

### FACTS

The following facts are pleaded in the complaint and, as is always the case, are presumed true for purposes of this motion.

**Ambac**

Ambac was founded in 1971. Through its principal operating subsidiary, Ambac Assurance Corporation, it guaranteed public and private finance obligations. It was, for example, the first financial guarantor to insure the principal and interest of municipal bonds. Ambac became known as a "monoline" insurer, because it provided only one type of insurance: a guarantee to protect against the risk of default on credit instruments.

Ambac built a gold-plated reputation as one of the leading financial guarantee insurers in the world. It was known for insuring only the highest quality municipal bonds, assessing risk to a "remote-loss" underwriting standard; Ambac's 2006 Form 10-K advised investors that it only insured exposures that 'are of investment grade quality with a remote risk of loss.' (Compl. ¶ 50.) In Ambac's public filings, and in public statements made by its executive officers, Ambac told investors "that it exercised rigorous and conservative underwriting standards to ensure that it only guaranteed and provided credit enhancement for the safest transactions, that it diligently monitored its insured portfolios, and that it was exposed to no material risk of loss." (Id. ¶ 11.) Various analysts from major commercial and investment banks, relying on those disclosures, issued reports stating in substance that Ambac was 'not the market,' and that, 'given Ambac's strict underwriting standards' (id. ¶ 13 (quoting report of Deutsche Bank)), it was unlikely to suffer significant losses on its mortgage portfolio.

Ambac first obtained a AAA credit rating—highest rating available—in 1979, and that rating never declined, regardless of the fortunes of the market, until the events giving rise to this lawsuit occurred. (Id. ¶¶ 12, 52.) Ambac's AAA credit rating was integral to its business success. Indeed, the Company's business model depended on maintaining its

2

AAA rating. In its 2006 Form 10-K, Ambac stated, "triple-A financial strength ratings . . . are an essential part of Ambac Assurance's ability to provide credit enhancement and any reduction in these ratings could have a material adverse affect on Ambac Assurance's ability to compete in the financial guarantee business." (Id. ¶ 54 (alteration in original).)

Maintenance of the AAA credit rating was, of course, dependent on the soundness of the investments that Ambac guaranteed. The company's stated capital and claims paying ability were but a small fraction of the net financial guarantees Ambac had in force in the first quarter of 2007; plaintiffs allege that the failure of as little as 5% of Ambac's insured portfolio would be enough to wipe out Ambac's excess capital. For that reason, the quality of the company's underwriting and risk exposure monitoring was highly material to investors. (Id. ¶ 56.)

### Ambac's Role in the Structured Finance Market

Beginning in at least 2005, Ambac guaranteed billions of dollars of private asset-backed structured financial instruments supported by collateral, including (1) residential mortgage backed securities ("RMBS"), which are collateralized by the underlying mortgages, and (2) collateralized debt obligations ("CDOs"), which are supported by large bundles of securitized RMBS rather than by the mortgages directly. Ambac directly insured the RMBS, and it issued credit default swaps ("CDS") to guarantee CDOs that were backed by bundles of RMBS. (Id. ¶ 4.)

According to the complaint, Ambac played a key role in the explosion of the RMBS and CDO markets, by providing direct insurance for RMBS and by providing protection for CDOs that were collateralized by bundles of RMBS via the use of credit default swaps. Ambac also allegedly insured increasing amounts of RMBS backed by

3

secondary lien second mortgage loans, often home equity lines of credit. Such loans are, of course, riskier than first lien loans, because repayment is directly related to the borrower's ability to pay down the underlying first mortgage. And Ambac did not need to allocate as much capital to support credit default swaps, which made them at once riskier and more profitable for the company. (Id. ¶¶ 63-67.)

Plaintiffs allege that Ambac "effectively sold its AAA credit rating to enhance the credit rating of bonds and asset backed securities." (Id. ¶ 54.) At the direction of its executive officers (defendants Genader and Leonard), Ambac drastically lowered its underwriting standards so that it could "wrap, or guarantee, billions of dollars of high risk securities." (Id. ¶ 14 (internal quotations omitted).) The alleged mastermind of this strategic shift was Genader, who purportedly focused Ambac on the generation of greater profits rather than on risk management and loss avoidance in an effort to achieve net income of $1 billion per year in the near future. (Id. ¶ 15.) His purported motive for increasing revenue was, of course, his own pocketbook; his compensation was tied directly to Ambac's reported returns on equity, and he profited handsomely during 2005 and 2006—to the tune of over $17 million. (Id. ¶ 69.)

The importance to Ambac of preserving its credit rating and avoiding excessive risk came into conflict with the desire to earn more and more money. Ambac's "safe and stable" municipal bond insurance business was a diminishing source of growth. (Id. ¶ 57.) In order to achieve the income levels Genader desired, Ambac became more and more reliant on revenues from "the riskiest corners of the derivative securities business." (Id. ¶ 15; accord id. ¶ 70.) This required Ambac to relax its historic underwriting standards in various ways. One way was to adopt a new underwriting model, one

4

designed to approve riskier portfolios of RMBS by relying on historical analysis of the originator's default rates rather than the quality of the loans that were actually in the securitized portfolio. (Id. ¶¶ 71-81.) Yet all the while, Ambac was advising the market that it was still engaged in conservative underwriting. (Id. ¶ 71.)

### Ambac Securitizes Its Risky Investments through Wachovia

Plaintiffs are investors who purchased a derivative product known as Structured Repackaged Asset-Backed Trust Securities, Callable Class A Certificates, Series 2007-1, STRATS(SM) Trust for Ambac Financial Group Inc. Securities, Series 2001-1 (hereinafter "STRATS"). The STRATS, which bore an interest rate of 6.7%, were issued on June 29, 2007; the purported class period runs from the date of issuance through and including April 22, 2008.

Plaintiffs and other STRATS owners have, by virtue of their investment, a beneficial interest in a trust that is funded with a single asset: securities issued by Ambac, known as Ambac February 2007 Directly-Issued Subordinated Capital Securities ("DISCS"), bearing an interest rate of 6.15%. The STRATS themselves, however, were not issued by Ambac; rather, they were packaged and issued by a subsidiary of Wachovia Bank, known as *Synthetic* Fixed-Income Securities, Inc. ("SFIS") (emphasis added)— which is one of the most aptly descriptive names for a special purpose vehicle since LHIW (Let's Hope It Works), Inc. See Wellman v. Dickinson, 475 F. Supp. 783 (S.D.N.Y. 1979).

Both the Wachovia-issued STRATS and the underlying Ambac-issued DISCS are asset-backed securities. Asset-backed securitization is a financing technique in which financial assets are pooled and converted into instruments that can be sold in capital

markets. An entity known as the "sponsor" (in this case, Ambac) originates or acquires a pool of financial assets (the DISCS), and then sells those assets to an issuer (SFIS/Wachovia), which places the assets in a specially created investment vehicle (usually a trust) that issues and sells interests (securities) that are "backed" (supported) by the underlying financial assets. Transactions that pool and securitize outstanding debt securities issued by third party companies are marketed to retail investors and are listed on a national securities exchange. (Compl. ¶ 2.) Payment on asset-backed securities is a function of cash flows generated by the assets in the underlying pool. (Id. ¶ 3.) In this case, while the DISCS are the underlying financial assets that immediately back the STRATS, the real underlying assets were the residential mortgages themselves, which had been securitized via RMBS, and perhaps securitized again into CDOs, which were guaranteed by Ambac, which securitized its own guarantees by creating the DISCS and selling them off to the public through the medium of SIFS.[1]

The complaint alleges—and it is obvious enough—that ABS securities and ABS issuers differ significantly from garden-variety corporate securities and their issuers when it comes to making the disclosures required under the federal securities laws. The issuer of the ABS (in this case, SFIS) generally has no business or management to describe—it is a so-called Special Purpose Vehicle ("SPV"), and its business consists of taking pools of assets that were assembled by someone else (many of which are themselves ABS, like RMBS and CDOs), and securitizing (or resecuritizing) those pools. Plaintiffs allege that ABS investors value securities by examining the characteristics and quality of the

---

[1] For some months, a collection of cartoons entitled "The Subprime Primer" has circulated on the internet and been distributed to students of business and finance. It describes (using language that cannot be quoted in a judicial opinion) the various steps in asset-backed securitization involving mortgages, from the taking out of a mortgage by a homebuyer who cannot afford it through the various levels of securitization of the ensuing risk and on to the ultimate default—i.e., the process summarized here. It is highly instructive.

underlying asset pool and the timing and certainty of cash flows from the underlying asset pool. Plaintiffs further allege that the Securities and Exchange Commission ("SEC") has recognized the unique nature of ABS products, to the point of providing a separate regulatory framework to govern them. Of particular importance to this case are SEC regulations that allow the issuer of an asset-backed security to make the disclosures required by the securities laws by referring to the filings of the issuer of the security that backs the ABS. 17 C.F.R. § 210 et seq. This rule recognizes the fact that an ABS issuer would find it difficult to obtain and analyze some other party's financial information, and so sends the investor back to the underlying issuer's financial statements for information pertinent to the investment decision. (Compl. ¶ 7.)

In the Prospectus and Registration Statement for STRATS here at issue, SFIS refers to Ambac's public filings with respect to the DISCS, and informed investors that they should "obtain and evaluate the same information concerning the Underlying Issuer as they would obtain and evaluate if they were investing directly in the DISCS or in other debt securities issued by the Underlying Issuer." (Id. ¶ 9 (internal quotations omitted).) The Prospectus also cautioned STRATS purchasers that they would "be exposed to the credit risk of the Underlying Issuer." The Underlying Issuer was, of course, Ambac. (Id. (internal quotations omitted).)

So plaintiffs and other members of the putative class purchased STRATS, an ABS backed solely by Ambac-issued debt securities (the DISCS), which were in turn backed by pools of collateralized debt obligations on mortgage-backed securities, or by mortgage-backed securities themselves, all of which were insured or guaranteed by Ambac, purportedly in accordance with its highly-touted historic underwriting standards.

The STRATS prospectus stated that it was a condition to the issuance of the STRATS that they be rated by Standard & Poor's Rating Services ("S&P") "at least as highly as the Underlying Securities." The Underlying Securities are the DISCS, which were (at the time) rated "A+" by S&P. (Id. ¶ 10.)

**The Alleged Securities Fraud**

Plaintiffs contend that Ambac, Genader and Leonard knew, or were reckless in not knowing, that Ambac's own publicly issued securities (including the DISCS that were repackaged into the STRATS) were losing market value because of the increasing likelihood of default on residential mortgages. This loss of value in turn jeopardized Ambac's ability to repay the debt securities (the DISCS) that backed the STRATS owned by plaintiffs. (Id. ¶ 14.)

Starting in 2005 and extending into 2007, plaintiffs allege that the quality of mortgage loans that were pooled together into RMBS-related deals deteriorated with each successive quarter. Ambac, which received monthly or quarterly reports on all the transactions that it guaranteed (id. ¶ 84), and which purported to conduct quarterly reviews and perform due diligence with respect to mortgage originators (id. ¶ 86), had to have been aware of the increase in delinquency rates and default rates on the underlying loans in the RMBS it was insuring. Yet Ambac did not mark its CDOs to market, as required by Statement of Financial Accounting Standards 133 (SFAS133), entitled "Accounting for Derivative Instruments and Certain Hedging Activities." This had the effect of inflating Ambac's earnings, allowing the company to show a profit and positive earnings per share when it was in fact experiences significant losses. (Id. ¶¶ 94-99.)

8

By June 2007, when the STRATS were marketed, Ambac and its executive officers were well aware that the housing market had been in decline for months (according to plaintiffs, this was apparent by late 2006. (See id. ¶¶ 71, 86.)

During the class period, rather than report collateral deterioration and mark-to-market write-downs in line with a deteriorating market, defendants allegedly bolstered Ambac's stock price by insisting that market deterioration did not indicate any deterioration in Ambac's portfolio. (Id. ¶ 90.) As noted above, various analysts bought into Ambac's representations, telling their customers that Ambac was "not the market" and that that the company's "conservative" management team was "comfortable that losses will be minimal." (Id. ¶ 148 (internal quotations omitted).) Yet when someone (not Ambac) finally disclosed what collateral underlay Ambac-insured CDOs, studies revealed that the RMBS insured by Ambac did not perform better than the market at all. While the average percentage of underlying mortgages in Ambac-insured RMBS that were in delinquency by 30-59 days was under 1% in the summer of 2006, that figure had doubled by the end of 2006, tripled by the late summer of 2007 and quadrupled by the end of 2007.

Plaintiffs allege that Ambac's reported earnings for the years 2002 through 2007 were more than wiped out by the massive write-downs and increased reserves that Ambac would be forced to take when the mortgage markets froze in the fall of 2007—only months after the issuance of the STRATS that plaintiffs purchased.

On January 16, 2008, a mere 6 months after SFIS issued the STRATS, Ambac announced that it was taking $5.4 billion in mark-to-market write-downs on its then $29 billion in exposure to CDOs supported by RMBS, as well as recognizing $1.1 billion of

actual impairment on these exposures. Ambac nearly tripled its loss reserves due to the deterioration of its direct RMBS portfolio, and reduced dividend payouts by 67%. In response to this announcement, the trading price of STRATS securities collapsed, falling from $20.35 per Class A Certificate to $8.95 in just three days. Further announcements during the class period revealed that Ambac's RMBS included a "wide range of loans" whose characteristics were far riskier than had previously been disclosed, and Ambac reported massive losses at the end of the first quarter 2008. Ambac's debt securities declined in value so dramatically that the price of STRATS reached $2.47 on November 18, 2008. (Id. ¶¶ 14-18.)

This lawsuit followed. Defendants moved to dismiss, arguing that plaintiffs lacked standing to sue them because they had purchased securities issued by an entity other than Ambac (SFIS). Defendants also asserted that the massive and detailed (267 paragraph, 103 page) complaint—which specifically identifies the time and content of dozens of allegedly false disclosures—failed to meet the pleading standards for a securities fraud complaint.

The motion is denied in all respects.

## DISCUSSION

### I.    Standard of Review

To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." Id. at 570; Iqbal, 129 S. Ct. at 1950-51.

Additionally, claims sounding in fraud must meet Rule 9(b)'s heightened pleading standard. See Fed. R. Civ. P. 9(b). To comply with Rule 9(b), a complainant "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)) (internal quotations omitted). Although Rule 9(b) provides that "intent, knowledge, and other conditions of mind may be averred generally," a plaintiff must allege sufficient facts to create a "strong inference" of scienter. Kalnit v. Eichler, 264 F.3d 131, 137-38 (2d Cir. 2001).

Similarly, the Private Securities Litigation Reform Act of 1995, Pub.L. 104-67, 109 Stat. 737 (1995) (codified as amended in sections of 15 U.S.C.) ("PSLRA"), requires a private plaintiff bringing claims under certain federal securities laws (including Section 10(b)) to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish a "strong inference" of scienter, as required by the PSLRA, the inference must be such that a

11

"reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). Plaintiffs may discharge their burden of pleading a strong inference of scienter under both the PSLRA and Rule 9(b) by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir.2007) (citation omitted) (PSLRA); accord In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 381 F. Supp. 2d 192, 206 (S.D.N.Y. 2004) (citations omitted) (Rule 9(b)).

## II.    Plaintiffs Have Standing to Sue Ambac for Securities Fraud

It is undisputed that the securities purchased by the plaintiffs were issued by SFIS, not by Ambac. The question posed by defendants' motion is whether plaintiffs have standing to sue Ambac for making material misrepresentations about its earnings, underwriting criteria and business prospects.

Defendants say not. Indeed, defendants say that the Second Circuit's decision in Nortel, which binds this Court, resolves the question in their favor.

Plaintiffs say not so.

I agree with plaintiffs.

To understand why, it is necessary to discuss Nortel, 369 F.3d 27 (2d Cir. 2004), in some detail.

In Nortel, the plaintiff purchased stock in a public company called JDS Uniphase, a manufacturer of fiber optic components. JDS Uniphase had an extensive business

12

relationship with a second public company, Nortel Networks, which was a global supplier of telecommunications services. Indeed, Nortel was JDS' largest customer, accounting for 10-15% of the latter's revenues. Nortel also made fiber optics products.

At a time when the market was flooded with rumors that JDS was going to sell part of its business to Nortel in exchange for Nortel stock, Nortel publicly made several rosy prognostications about the demand for *its* (i.e., Nortel's) fiber optics products, and also predicted 30% growth in revenue and earnings for 2001. Both Nortel and JDS stock moved up following Nortel's statements. However, within days after Nortel and JDS consummated the asset sale described above, Nortel cut revenue estimates for the quarter and announced that revenue growth for 2001 would be closer to 15%. Following this announcement, the value of both Nortel and JDS shares tumbled in heavy trading.

Plaintiffs sued Nortel under Section 10(b) and Rule 10b-5 thereunder, alleging that Nortel's favorable statements about its own business prospects (1) were false, in that Nortel had actually known for some time that demand was falling for its fiber optics products, and (2) had caused *JDS's stock price to inflate*, thereby causing plaintiffs to purchase their JDS shares at an artificially high price. Nortel sought dismissal on the ground that JDS shareholders lacked standing to sue Nortel for allegedly misleading disclosures about Nortel's business. The district court (Berman, J.) granted Nortel's motion.

The Second Circuit affirmed Judge Berman's ruling. The Court of Appeals noted that neither Section 10(b) of the Securities and Exchange Act of 1934 ('34 Act) nor Rule 10b-5 thereunder explicitly created a private right of action in favor of anyone. Nonetheless, various courts had implied such a right of action since at least 1946. Nortel,

369 F.3d at 30-31. In Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), the

Supreme Court had ruled that only purchasers or sellers of securities could sue under the

antifraud provisions of the '34 Act and Rule 10b-5. Writing for the panel in Nortel,

Judge Pooler noted that:

> In this case, plaintiffs are quick to point out that they did purchase securities after
> the alleged misrepresentations took place. However, instead of purchasing
> securities of the entity that made the alleged misrepresentation, they purchased
> securities of a company that had a business relationship with the misrepresenter.
> They claim that they have met the Blue Chip Stamps standing requirements
> because they purchased the security at issue in their lawsuit. They base this
> argument on the references in Section 10(b) and Rule 10b-5 to fraudulent conduct
> "in connection with the purchases or sale of *any* security." In plaintiffs' view, the
> word "any" indicates that the intent of Congress and the SEC was to create
> universal standing for purchasers of securities, allowing anyone who made use of
> the markets to sue under Rule 10b-5.

369 F. 3d at 32 (citations omitted).

Having set out plaintiffs' argument, the Court of Appeals proceeded to reject it:

> Plaintiffs assume that the phrase "any security" includes securities of any
> company affected in some way by the misrepresentation and not just securities of
> the company that makes the material misstatements. However, in our view, the
> phrase indicates that the regulations reach all types of securities, and not any
> affected company's securities. Furthermore, plaintiffs' interpretation of this
> passage is entirely at odds with the purchaser-seller requirement in *Blue Chip*
> *Stamps* that "limits the class of plaintiffs to those who have at least dealt in the
> security to which the prospectus, representation, or omission relates."

Id. (citations omitted).

After additional discussion of precedents, the Circuit summarized its holding:

"Stockholders do not have standing to sue under Section 10(b) and Rule 10b-5

when the company whose stock they purchased is negatively impacted by the material

misstatement of another company, whose stock they do not purchase." Id. at 34.

For several years after Nortel, various defendants, relying on the language just

quoted and an equally sweeping statement elsewhere in the Second Circuit's opinion,

14

argued—sometimes successfully—that no liability can exist under Rule 10b-5 for "statements by a non-issuer [of the security that is the subject of the suit] about a non-issuer." See e.g., In re NYSE Specialists Sec. Litig., 405 F. Supp. 2d 281, 305 (S.D.N.Y. 2005) (citation omitted). The Second Circuit put that notion to rest, however, when it reversed the district court's dismissal of the complaint in the NYSE Specialists case. See In re NYSE Specialists Sec. Litig., 503 F.3d 89 (2d Cir. 2007). In an opinion by now-Justice Sotomayor, the court noted that an overly broad reading of the above-quoted language "would place beyond the reach of Rule 10b-5 false statements made by underwriters, brokers, bankers, and non-issuer sellers." Id. at 102. Justice Sotomayor went on to say that this was not what the Nortel court had in mind:

> On the basis of a business relationship between JDS Uniphase and Nortel Networks, the plaintiffs claimed that their purchase price for JDS Uniphase stock had been inflated by Nortel Networks' false statements about itself. In the particular circumstances of the case, the connection between Nortel Networks' false statements about itself and the plaintiff's purchase of JDS Uniphase stock was too remote to sustain an action under Rule 10b-5. In short, the district court incorrectly read Nortel Networks to mean that an action under Rule 10b-5 for false statements about a security purchased by the plaintiff lies only against the issuer of the security, or that only statements about a security issuer are actionable. Accordingly, we vacate the district court's decision with respect to statutory standing.

Id.

It is thus quite clear that Defendants' simplistic analysis of Nortel is predicated on a reading of that decision that the Second Circuit has disavowed. Whether a purchaser or seller of a security has standing to bring an action under the antifraud provisions of the '34 Act is ultimately a function of the remoteness between the false statements and the plaintiff's purchase of a particular stock. Standing is not exclusively a function of who made the false statements, although that is undoubtedly one factor a court can consider in

15

making its determination. Thus, much as defendants might wish it, <u>Nortel</u> does not mandate dismissal of plaintiffs' complaint.

Indeed, much of what is quoted above from <u>Nortel</u> augurs in favor of according these plaintiffs standing to sue Ambac. Unlike the plaintiffs in <u>Nortel</u>, plaintiffs here purchased a security that was by its terms directly related to the business of Ambac. The security was a derivative created out of financial assets that belonged to Ambac. The security was no doubt created at the behest of Ambac; the idea behind securitizing financial assets is to pass the risk represented by those assets off to someone else. <u>See generally</u> Steven L. Schwarcz, <u>The Alchemy of Asset Securitization</u>, 1 Stan. J. L. Bus. & Fin. 133, 135 (1994). The securities were held in a trust "for Ambac." Indeed, the securities' name includes the word Ambac; the name does not include any reference to Wachovia or SFIS, the technical issuer.

Furthermore, the security purchased by the plaintiffs was "a security to which the alleged misrepresentations relate. . . ." In <u>Nortel</u>, the Second Circuit, relying on the Supreme Court's decision in <u>Blue Chip Stamps</u>, recognized that relationship as the key element in the standing equation. The SEC understands this; it requires the special purpose vehicles that issue derivatives like the STRATS to tell potential purchasers that they should look to the disclosures made by the company whose assets are securitized when they assess the risk of their investment. Thus, a rule promulgated by the agency responsible for regulating the securities markets makes it clear that plaintiffs and the class they seek to represent—persons who could be expected to look to Ambac's representations about its business in making an informed decision about whether to purchase or sell STRATS are part of "the precise class for the protection of which the

16

1934 Act was enacted." Deutschman v. Beneficial Corp., 841 F. 2d 502, 507 (3d Cir. 1988). Indeed, on the facts alleged, I cannot imagine any other entity whose SEC filings and public statements made to the press and to market analysts would have the slightest relevance to an informed decision to deal in the STRATS that are the subject of this lawsuit.

Nothing in In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig., 586 F. Supp. 2d 172, 179-80 (S.D.N.Y. 2008), suggests that these plaintiffs ought not be accorded standing to sue Ambac. As plaintiffs note in their memorandum of law, the plaintiffs in Refco lacked standing because they neither purchased nor sold anything, and nothing was purchased or sold on their behalf. That is simply not the case here.

Finally, in Blue Chip Stamps, the Supreme Court held that "policy considerations" could properly be taken into account when deciding whether an entity has standing to sue under Section 10(b) and Rule 10b-5. See 421 U.S. at 737. Relevant policy consideration supports allowing plaintiffs to sue Ambac.

The primary purpose of the securities laws is to provide protection to investors. See e.g., Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 (1976). The development and evolution of new and complex financial instruments, such as ABS and RMBS and CDOs, created new challenges for investors who are trying to make informed decisions. While scholars and commentators have called for a variety of new laws to deal with this development—with some even going so far as to suggest making subprime mortgages themselves subject to the federal securities laws,[2] and others suggesting a revision of

---

[2] See Richard E. Mendales, Collateralized Explosive Devices: Why Securities Regulation Failed to Prevent the CDO Meltdown, and How to Fix It, 2009 U. Ill. L. Rev. 1359, 1407 (2009); Jonathan Macey et al., Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages, 34 J. Corp. L. 789, 813 (2009). Professor Mendales proposes modification of the securities laws to cover mortgages and

Blue Chip Stamps' "purchaser or sale" requirement[3]—we need not consider these and

other interesting suggestions for *expanding* existing law, because in our case we are

dealing with instruments that are admittedly securities, and that are already subject to

federal law. The issue for this Court is whether it makes sense, as a policy matter, to

allow purchasers of a derivative security to bring suit under Section 10(b) and Rule 10-

b(5) against the firm whose assets have been securitized by a shell corporation, on the

theory that persons who purchased those securities were defrauded about their value, not

by some statement about the issuer, but by inaccurate descriptions of the securitized

assets that were made by the owner of those assets.

The question answers itself. SPVs like SFIS have been described as "essentially

robot firms" that are "thinly capitalized" and "have no employees, make no substantive

economic decisions, have no physical location, and cannot go bankrupt." Gary Gorton

and Nicholas S. Souleles, Special Purpose Vehicles and Securitization, in The Risks of

Financial Institutions 550 (Mark Carey & Rene Stulz eds., 2007). By design, the SPV that

issues the securities does not function as a separate, independent entity except on paper.

Its purpose it to serve as a pass-through vehicle for money going to corporations like

---

other debt instruments that will be securitized. Mendales, supra, at 1407. Macey et al. argue instead that
the current antifraud provisions of the securities laws are sufficient, but should be applied more broadly.
They argue, inter alia, that because the securitization process turns subprime mortgages into traded
securities, the mortgage origination itself falls under the securities laws as a transaction in connection with
the purchase or sale of a security. Macey et al., supra, at 813. Therefore, they argue subprime borrowers
should be entitled to the protections of the antifraud provisions of the securities laws with respect to their
mortgages.

[3] See Doug Winnard, Know When to Hold 'Em, Know When to Fold 'Em: The Collapse of the Auction
Rate Securities Market and the Problem of Standing for Securities Holders Under Rule 10b-5, 104 Nw. U.
L. Rev. (forthcoming 2010), available at http://ssrn.com/abstract=1392046. Winnard argues that investors
in auction-rate securities (a financing instrument created in the mid-1980s, whose market collapse in early
2008 was an early casualty of the financial crisis) should be allowed to bring "holder" claims under 10b-5;
claims which have been disallowed since Blue Chip Stamps. Id. at *4. Further, Winner argues that
"developments in both securities markets and securities law require the Court to –examine the standing
requirements for injured securities holders." Id. at *6.

Ambac and securities (and the risk they represent) going to investors like plaintiffs. Plaintiffs could never recover anything from the SPV, so limiting the right to sue for misrepresentations in connection with the purchase of a derivative to the shell corporation that is technically the "issuer" means that the investing public has no recourse, while underlying issuers like Ambac—which benefited by passing off its risk to the investing public, while being handsomely paid for doing so—are insulated from their own alleged frauds.

It is true that allowing plaintiffs to sue Ambac expands the class of persons who can sue that company. However, I agree with Judge Schwarzer in Zelman v. JDS Uniphase Corp., 376 F. Supp. 2d 956 (N.D. Cal. 2005) that this expansion will not lead willy-nilly to a world in which any investor can sue any corporation on any cock-and-bull theory that the corporation's public statements have affected some wholly unrelated security. Id. at 961-63. Nortel is still good law in this Circuit, so where the relationship between Corporation A's disclosures and Corporation B's stock price is too remote, Corporation B's shareholders cannot sue Corporation A under the antifraud provisions of the '34 Act. In this case, however, the relationship between Ambac's disclosures and the STRATS is anything but remote, as the SEC regulations make clear. Therefore, this Court is perfectly comfortable in concluding that plaintiffs have standing to sue Ambac if material misstatements made by that company illegally inflated the price of the STRATS that issued "for benefit of Ambac."[4]

---

[4] Obviously, one must engage in a line-drawing exercise in order to decide whether Issuer A's securities are or are not so remote from Issuer B as to preclude suit against Issuer B by the holders of Issuer A's securities. The inextricable intertwining of Ambac with the STRATS makes this an easy case—it is hard to imagine a closer (or less remote) relationship—just as Nortel strikes me as an easy case in the other direction. It may not always be easy to figure out on which side of the "remoteness/closeness" line a situation falls, but this Court finds it unnecessary to make any black-and-white pronouncement in order to dispose of the challenge here mounted to plaintiffs' standing.

## III.    The Pleading is Otherwise Sufficient

With standing established, it is clear that there is no basis on which to dismiss the instant complaint.

"The basic elements of a cause of action for securities fraud under Section 10(b) and Rule 10b-5 are (1) a material misstatement or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation,' (5) economic loss, and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." In re Salomon Analyst Metromedia Litig., 544 F. 3d 474, 478 n.1 (2d Cir. 2008) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005)) (internal quotations omitted). In addition, as discussed above, plaintiff must identify specific fraudulent statements or omissions, and must state with particularity facts giving rise to a strong inference of scienter.

The Plaintiffs have clearly met their burden of identifying specific alleged fraudulent statements. They have identified numerous specific statements and disclosures that they allege were fraudulent, and identified who made them, when they were made and why they were allegedly fraudulent.

As discussed above, the alleged misstatements were made in connection with the purchase or sale of a security, and Plaintiffs have adequately pled that they relied on the alleged misstatements and suffered an economic loss. Further, they have adequately pled loss causation. Plaintiffs have identified several corrective disclosures that allegedly demonstrated the falsity of defendants' previous statements, and have also alleged that

the value of their securities declines following the corrective disclosures.  That is

sufficient at the pleadings stage.  See Dura Pharm., 544  U.S. at 346-8.

The only remaining issue is whether Plaintiffs have adequately pled, with

sufficient particularity, "facts giving rise to a strong inference that the defendant acted

with the required state of mind."  PSLRA, 15 U.S.C. § 78u-4(b)(2).  The Second Circuit

has stated that:

> the required strong inference may arise where the complaint sufficiently alleges
> that the defendants: (1) benefitted in a concrete and personal way from the
> purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or
> had access to information suggesting that their public statements were not
> accurate; or (4) failed to check information they had a duty to monitor.

Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc., 531 F.3d

190, 194 (2d Cir. 2008) (citing Novak v. Kasaks, 206 F. 3d 300, 311 (2d Cir. 2000)).

"When the defendant is a corporate entity, this means that the pleaded facts must create a

strong inference that someone whose intent could be imputed to the corporation acted

with the requisite scienter.  In most cases, the most straightforward way to raise such an

inference for a corporate defendant will be to plead it for an individual defendant."  Id. at

195.

Here, Plaintiffs have adequately pled specific facts that, if proved, raise the

necessary strong inference as to both Genader and Leonard, and consequently raised such

an inference with regards to Ambac.

Plaintiffs have alleged that Genader's compensation was tied to short-term profits

and that he actively took steps to increase those short-term profits at the expense of

prudential risk management for the purpose of increasing his own compensation.

Plaintiffs also allege that Genader was closely involved in the formulation of Ambac's

21

public statements and representations, and that he knew they were materially misleading, because it was at his behest that Ambac was no longer adhering to the underwriting standards it was touting to the public. These allegations are sufficient to raise a strong inference of scienter as to defendant Genader.

As for Leonard, Plaintiffs have alleged in detail that he either made public statements or participated in conference calls, in which he represented both that Ambac was continuing to be conservative in its approach and that it was actively monitoring its own portfolio to ensure that general market woes were not negatively affecting Ambac. Taking the allegations of the complaint as true, then Leonard either: (1) knew facts or had access to information that Ambac's public statements about its underwriting and risk management were inaccurate, because Ambac was not adhering to its historically conservative approach; or (2) failed to check information he had a duty to monitor, namely, that Ambac was in fact monitoring the mortgage portfolio that underlay its insurance and was accurately disclosing the risks inherent in that portfolio. Either of these scenarios raises a sufficiently strong inference of scienter as to defendant Leonard. See Dynex Capital, 531 F.3d at 194.

## CONCLUSION

For the foregoing reasons, Defendants motion to dismiss the Complaint is denied. This constitutes the decision and order of the Court. The Clerk of the Court is instructed to remove the motion to dismiss (docket no. 15) from the Court's outstanding motion list.

Dated: December 21, 2009

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

22