UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STANLEY TOLIN and EDWARD
WALTON, Individually and On Behalf of All
Others Similarly Situated,

                  Plaintiffs,

    v.

AMBAC FINANCIAL GROUP, INC.,
ROBERT J. GENADER and SEAN T.
LEONARD,

                  Defendants.

No. 08 Civ. 11241 (CM)

---

**PLAINTIFFS' MEMORANDUM OF LAW AS DIRECTED
BY THE COURT'S FEBRUARY 5, 2010 ORDER GRANTING
REARGUMENT IN CONNECTION WITH
<u>DEFENDANTS' MOTION TO DISMISS</u>**

**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
Kelly A. Noto
Kira German
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND RELEVANT TO AMBAC AND THE STRATS ........................ 3

      A.     Ambac's Business ................................................................................... 3

      B.     Ambac Issues The DISCS ....................................................................... 4

      C.     Wachovia Purchases and Repackages DISCS Into STRATS ................................ 5

LEGAL ARGUMENT ........................................................................................................ 10

I.      AMBAC'S FRAUDULENT DISCLOSURES CAUSED THE STRATS
        PURCHASERS' ENTIRE INJURY .............................................................. 12

II.     CREATION OF THE STRATS WAS FORESEEABLE TO AMBAC ......................... 12

III.    THE RELATIONSHIP BETWEEN THE PARTIES INVOLVED IN
        CREATING BOTH THE DISCS AND THE STRATS MAKES AMBAC
        A NON-REMOTE SELLER ........................................................................ 17

CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

**Cases**                                                                                  **Page(s)**

*Beneficial Commercial Corporation v. Murray Glick Datsun, Inc.*,
   601 F.Supp. 770 (S.D.N.Y. 1985) ........................................................................ 11

*Clark v. Bendix Corporation*,
   345 N.Y.S.2d 662 (2d Dept. 1973) ...................................................................... 16

*Deutschman v. Beneficial Corp.*,
   841 F.2d 502 (3d Cir. 1988), *cert. den.*, 490 U.S. 1114 (1989) ............................... 19

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ............................................................................................ 20

*Fredericks v. American Export Lines, Inc.*,
   227 F.2d 450 (2d Cir. 1955) ............................................................................... 15

*Hall v. E.I. Du Pont De Nemours & Co., Inc.*,
   345 F.Supp. 353 (E.D.N.Y. 1972) ...................................................................... 15

*MacPherson v. Buick*,
   217 N.Y. 382 (1916) .................................................................................... *passim*

*Mull v. Colt Co.*,
   31 F.R.D. 154 (S.D.N.Y. 1962) ..................................................................... 11, 15

*In re NYSE Specialists Sec. Litig.*,
   503 F.3d 89 (2d Cir. 2007) ................................................................................. 16

*Sanchez v. State of New York*,
   99 N.Y.2d 247 (N.Y. Ct. App. 2002) ................................................................. 16

*Smith v. Peerless Glass Co., Inc.*,
   259 N.Y. 292 (1932) .......................................................................................... 15

*Yates v. Dow Chemical Company*,
   414 N.Y.S.2d 200 (2d Dept. 1979) ..................................................................... 11

## PRELIMINARY STATEMENT

Ambac Financial Group, Inc. ("Ambac"), a leading firm in the financial insurance industry with expertise in asset-backed securitizations, seeks to avoid liability for its own false public statements by claiming that it did not know and could not know that its statements would be disseminated to purchasers of derivative securities called Structured Repackaged Asset-Backed Trust Securities (STRATSSM) Callable Class A Certificates, Series 2007-1 ("STRATS") held by the STRATSSM Trust for Ambac Financial Group, Inc. Securities, Series 2007-1 ("STRATS Trust"), which were designed by Wachovia Capital Markets, LLC ("Wachovia") and sponsored by Wachovia's wholly owned subsidiary, Synthetic Fixed Income Securities, Inc. ("SFIS"). Wachovia's STRATS were well known to Ambac, such that Ambac cannot now claim surprise or unfairness that its false statements reached investors beyond those that bought securities issued directly by Ambac. Indeed, Wachovia and Ambac have a long-standing relationship, as Wachovia served as an underwriter for various Ambac-issued securities over the course of several years and Wachovia's repackaging of securities (including Ambac securities) was widely reported. Additionally, prior to repackaging Ambac securities, Wachovia had repackaged securities issued by several of Ambac's underwriters, including Goldman Sachs and J.P. Morgan, as well as issuing STRATS trusts for at least 20 other companies, including IBM, Walmart, Boeing, Allstate and DaimlerChrysler, to name just a few.

So pervasive and important were derivatives to the capital markets, of which Ambac was a major participant, that the New York Stock Exchange ("NYSE") issued a press release in 2006 for the sole purpose of touting that four new structured products were to be listed on the NYSE, including a STRATS trust designed and sold by SFIS,

Wachovia's wholly-owned subsidiary.  Four New Structured Products Join the NYSE in May 2006, press release (June 16, 2006), available at http://www.nyse.com/press/1150452535116.html.  The press release also stated, in pertinent part, that "the NYSE trades more than 575 structured products with a total market value greater than $125 billion.  The Exchange's Structured Products Group reported a healthy new-listings environment for 2006, with 30 new offerings valued at $11.2 billion."  *Id*.  In fact, the structured finance market had become so commonplace that, as one financial blog stated (quoting a contact at Morgan Stanley), it was a *fait accompli* that additional complex derivative securities would be created from Ambac's DISCS.  Mish's Global Economic Trend Analysis:  Stock Buybacks: A Good Thing Or a Slipped Discs?  (October 30, 2007), available at http://globaleconomicanalysis.blogspot.com/2007/10/stock-buybacks-good-thing-or-slipped.html ("Ambac Financial...has just issued $400 million worth of new debt in complex hybrid debt notes, so-called [DISCS]…. Think about the very complex nature of this debt, which will be sitting in someone's books as an asset; ***think about all the even more complex derivatives that will be, without question, created based on this debt***.") (emphasis added).

Indeed, Ambac and its rival, MBIA, Inc., became lynchpins of the financial system by selling derivative based guarantees on derivative securities earlier throughout the 2000s.  Ambac – a sophisticated financial company that specialized in esoteric asset-backed securities – simply cannot establish in the context of a motion to dismiss that it was not foreseeable that their false statements would lead to securities fraud liability to purchasers of repackaged securities such as the Ambac STRATS.

2

## FACTUAL BACKGROUND RELEVANT TO AMBAC AND THE STRATS

### A.    Ambac's Business

Ambac was a leading guarantor of public and structured finance obligations and was well-known for its coveted "AAA" investment grade credit rating. Ambac utilized its AAA rating to provide "financial guarantees for public finance and structured finance obligations, which included enormously complex financial products such as residential mortgage backed securities ("RMBS") and collateralized debt obligations ("CDOs") supported by large bundles of securitized RMBS, and also utilized credit default swaps ("CDS") as a derivative guarantee of CDOs of RMBS.

Notably, Ambac declared its familiarity with insuring derivative, asset-backed securities. Ambac's public disclosures referred to the necessity and importance of looking to the underlying collateral to decipher the underlying securities' worth and value. Ambac repeatedly acknowledged to investors that it needed to consider "the unique attributes of the underlying collateral and transaction" before making an exposure decision with respect to asset-backed derivative securities. *See, e.g.*, Ambac Financial Group, Inc., (Form 10-Q) at 27 (Aug. 9, 2006); *see also* Ambac Financial Group, Inc., (Form 10-K) at 11, 84 (Mar. 1, 2007) ("the amount and quality of the asset coverage required is determined by the historical performance of the underlying asset type or the transactions specific underlying assets"; "the criteria for an exposure to be included on the adversely classified credit listing includes…underperformance of the underlying collateral (for collateral dependant transactions such as mortgage-backed securities), problems with the servicer of the underlying collateral and other adverse economic trends[.]").

Statement of Financial Accounting Standards 133, entitled "Accounting for Derivative Instruments and Certain Hedging Activities" ("SFAS 133"), required Ambac to account for the value of its CDS exposures to CDOs.  Although Ambac failed to comply with the governing standards of SFAS 133, studies have since demonstrated that as of March 30, 2007 (less than two months after the DISCS were issued), Ambac had exposure to approximately $20 billion of CDS on CDOs of asset-backed securities.  On June 30, 2007 – shortly before the STRATS were issued – Ambac had exposure to approximately $24.3 billion of CDS on CDOs of asset-backed securities.

### B.    Ambac Issues The DISCS

Against this background, Ambac issued its own asset-backed security, DISCS, which Wachovia then repackaged into publicly traded STRATS.  On February 7, 2007, Ambac entered into an underwriting agreement with Citigroup Global Markets Inc. ("Citigroup"), Goldman Sachs & Co. ("Goldman Sachs") and J.P. Morgan Securities, Inc. ("J.P. Morgan"), as representatives of several underwriters, including Merrill Lynch, Pierce Fenner & Smith Incorporated ("Merrill Lynch"), HSBC Securities (USA) Inc. ("HSBC"), Lehman Brothers Inc. ("Lehman Brothers"), UBS Securities LLC ("UBS") and Wachovia (collectively, the "Underwriters"), to complete a public offering of $400 million aggregate principal amount of Directly-Issued Subordinated Capital Securities (DISCS).  Ambac Financial Group Inc., Directly-Issued Subordinated Capital Securities DISCS(SM) (Form 424B5) at S-52 (February 8, 2007) ("DISCS Final Prospectus").  The DISCS were not listed on any stock exchange.  *See* DISCS Final Prospectus at S-53 ("The DISCS are a new issue of securities with no established trading market and will not be listed on any national securities exchange. The underwriters have advised us that they

intend to make a market for the DISCS, but they have no obligation to do so and may discontinue market making at any time and for any reason without providing any notice. We cannot give any assurance as to the liquidity of any trading market for the DISCS.").

In addition to selling off its own debt and transferring the risk associated with it, Ambac's other stated purpose in offering the DISCS was to raise money to repurchase its common stock. On February 7, 2007 (the date of the agreement with Goldman Sachs and the other Underwriters to issue the DISCS) Ambac entered into a second agreement with Goldman Sachs whereby Ambac would use the proceeds from the sale of the DISCS to repurchase $400 million of Ambac's common stock on an accelerated basis. *See* Ambac Financial Group Inc. (Form 8-K) at 2 (February 12, 2007). Thus, Ambac needed the proceeds from the sale of the DISCS to be able to repurchase its stock in accordance with its agreement with Goldman Sachs. It is unclear why Ambac chose to issue DISCS rather than issuing simple, straight-forward corporate bonds as it had done previously on numerous occasions. Any benefit to issuing DISCS rather than bonds is likely available through discovery.

### C.    Wachovia Purchases and Repackages DISCS Into STRATS

Wachovia created its wholly-owned subsidiary, Synthetic Fixed Income Securities, Inc. ("SFIS") – the creator of the trust for the STRATS at issue here – on April 12, 2001, for the sole, limited purpose of "acquiring, owning, holding, selling, transferring, assigning or otherwise dealing with or in certain debt or asset backed securities, issuing offering and selling certificates or notes that represent interests in or are secured by such debt or asset backed securities, and generally any activities that are incidental to the foregoing." *See* SFIS, STRATS(SM) Trust for Ambac Financial Group,

Inc. Securities Series 2007-1 (Form 424B2) ("STRATS Final Prospectus") at S-17 (July 17, 2007). Significantly, the business activities of SFIS are limited solely to these functions by its Certification of Incorporation. *See id*. The STRATS Final Prospectus further provides that SFIS:

> [A]cquires fixed income securities from time to time and transfers them into trusts that it forms which in turn issue securities, such as the [STRATS], backed by the transferred fixed income securities and also backed by or subject to any other assets arranged for by [SFIS]. [SFIS] sells the securities issued through these securitizations in both public offerings and private placements. In each such offering, Wachovia Securities, [SFIS's] affiliate, has been the managing or sole underwriter or, in the case of the private placements, the initial purchaser of the securities.

*Id*. According to the STRATS Final Prospectus, SFIS (and, therefore, Wachovia) has been securitizing fixed income securities in the same way it had securitized the DISCS since 2003, and had completed 27 public securitizations prior to issuing the STRATS (one in 2003, 16 in 2004, 6 in 2005, and 4 in 2006). *Id.* The aggregate principal amount of securities issued in these securitizations was approximately $748 million. *Id*. SFIS, the creator of the STRATS Trust, is a so-called Special Purpose Vehicle ("SPV") that has no business or management to describe, and its business consists solely of taking pools of assets that were assembled by someone else and securitizing (or resecuritizing) them (indeed, the underwriting agreement for the STRATS certificates was executed by only two companies – SFIS and Wachovia – and the *same* individual signed the agreement on behalf of *both* companies, *see* SFIS, STRATS(SM) Trust for Ambac Financial Group, Inc. Securities Series 2007-1, (Form 8-k) ("STRATS 8-K"), Exhibit 1 (signature page) (July 18, 2007)).

As recognized by the Court, the complexity of securities instruments has expanded tremendously in recent years. Asset-backed securities became very popular as a result of the most recent market boom which produced various investment vehicles by which asset-backed securities could be repackaged and sold on the open market. Thus, Ambac and each of the Underwriters of the DISCS offering knew, or at the very least should have known, that the DISCS were likely to be repackaged into a trust because this was a common practice in the industry.

Prior to repackaging the DISCS, SFIS had created 27 such STRATS(SM) Trusts, comprising nearly $750 million in assets. *See* STRATS Final Prospectus at S-17. Included among the 20 companies for whom STRATS were created, were two of the DISC underwriters. *See, e.g.*, SFIS, Floating Rate Structured Repackaged Asset-Backed Trust Securities (STRATS(SM)) Trust for Goldman Sachs Group Securities, Series 2006-2 (Form 424B5), at S-1 to S-6 (March 13, 2006) (Wachovia underwrites Goldman Sachs 6.125% Notes due 2033 and later purchases the same notes repackaging them into publicly traded Goldman Sachs STRATS); SFIS, Floating Rate Structured Repackaged Asset-Backed Trust Securities (STRATS(SM)) Trust for JPMorgan Chase Capital XVII Securities, Series 2005-5 (Form 424B2), at S-1 to S-6 (Dec.1, 2004) (Wachovia repackages J.P. Morgan notes into publicly traded J.P. Morgan STRATS).

Wachovia was not the only financial services company that repackaged securities into publicly traded trusts. Many of the Underwriters here created similar trusts under a variety of other proprietary names. *See, e.g.,* Merrill Lynch Depositor, Inc., PPLUS Trust Series SPR-1 (Form 424B2), at S-1 to S-5 (Nov. 19. 2003) (Merrill Lynch creates a "PPLUS" trust for 6.875% Notes due 2028 issued by Sprint Capital Corporation);

Structured Products Corp., CORTSsm Trust for BellSouth Debentures (Form 424B5), at S1 to S-5 (May 13, 1999) (Salomon Smith Barney, a division of Citigroup (an underwriter and the Sole Structuring Advisor for the DISCS), creates a similar product under the name "CORTSsm,"); Corporate Asset Backed Corporation, CABCO Series 2004-1 Trust (Goldman Sachs Capital I) (Form 424B5), at S-1 to S-7 (Feb. 25, 2004) (UBS's Paine Webber creates a similar product called "CABCO".).  Although not an Underwriter, financial giant Morgan Stanley (through its wholly owned subsidiary MS Structure Asset Corp.) also routinely created similar trusts under the proprietary term "SATURNS."  *See, e.g.,* MS Structured Asset Corp., Structured Asset Trust Unit Repackaging SATURNS (SM) Goldman Sachs Group Inc. Debenture Backed Series 2003-11 (Form 424B5), at S-1 to S-9 (March 5, 2003).

As part of its role as an underwriter for the DISCS, Wachovia purchased $20 million worth of DISCS from Ambac as part of the underwriting syndicate.  Four months later, Wachovia through its wholly owned subsidiary, SFIS, indicated its intent to create a STRATS(SM) Trust for the DISCS.  *See* STRATS Final Prospectus at S-1, S-14, S-16.  Pursuant to the STRATS Final Prospectus, to create the STRATS Trust Wachovia would re-purchase $37 million DISCS and sell those DISCS to SFIS, from which SFIS in turn would create the STRATS Trust.  *See id*. at S-16.  Although Wachovia had purchased $20 million in DISCS directly from Ambac just months earlier, the STRATS Trust was funded using DISCS that Wachovia, purchased from the "secondary market."  *See id*.  Indeed, the initial STRATS prospectus provides:

> The Underlying Securities will not be part of a subscription or unsold allotment as part of the initial distribution of such securities pursuant to a registered offering under the Securities Act, and if [Synthetic] or any underwriter of the related series of certificates offered under this

> prospectus was an underwriter or an affiliate of an underwriter in a
> registered offering of the Underlying Securities, the Underlying Securities
> will have been purchased at arm's length in the secondary market at least
> three months after the last sale of any unsold allotment or subscription by
> the affiliated underwriter that participated in the registered offering of the
> Underlying Securities.

SFIS, STRATS(SM) Trust for Ambac Financial Group, Inc. Securities Series 2007-1,

(Form 424B5) (the "STRATS Initial Prospectus") at S-20 (June 29, 2007). Given the fact

that DISCS were not publicly traded and could only be purchased through privately

negotiated transactions, it is likely that Wachovia's "secondary market" purchase was

directly linked to the original DISCS Underwriters, who would be easily able to identify

DISCS owners. Wachovia's "secondary market" purchase, therefore, was closely tied to

Ambac's original DISCS offering.

Specifically, after buying $37 million DISCS in privately negotiated purchases

from sellers it could identify, Wachovia then sold the $37 million DISCS to its SFIS

subsidiary to create the STRATS. *See* STRATS Final Prospectus S-16. SFIS, pursuant

to a trust agreement with U.S. Bank Trust National Association ("Trustee"), then set up a

New York common law trust, the STRATS Trust. *See id.* at S-14, S-16 (As indicated by

its name, the STRATS Trust was created solely for the purpose of holding DISCS only).

SFIS then sold the DISCS into the Trust. *Id.* As intended by Wachovia's creation of

SFIS (the STRATS SPV), and as stated in the trust agreement between SFIS and the

Trustee, the property of the trust consisted solely of one underlying asset – here, the

$37,500,000 aggregate principal amount of Ambac's 6.15% DISCS. *See id.* at S-16, S-

17; STRATS 8-K, Exhibit 4.2 at 5-6. In this way, the STRATS trust differed materially

from mutual funds or ETFs, which are investment vehicles comprised of a variety of

different securities issued by various entities, the value of which depends on the

combined value of all of their holdings. The Trust then issued the STRATS in the amount of $34,287,300, with Wachovia purchasing over one-half of the STRATS as the lead underwriter. The STRATS were ultimately listed and traded on the NYSE. *See* STRATS Final Prospectus at S-33.

In accordance with SEC requirements (*see* 17 C.F.R. § 210, *et. seq*.), Wachovia included language in the STRATS Final prospectus directing purchasers of the STRATS to look *directly to the disclosures of Ambac, the underlying issuer*, to evaluate the viability of the STRATS. Thus, the STRATS Final Prospectus cautions purchasers of the Class A Certificates to look to the prospectus of the Underlying Securities [DISCS]: "No investigation of the Underlying Securities or the Underlying Issuer was made by the Depositor [SFIS], the Underwriters or the Trustee in connection with the offering of Class A Certificates." *Id*. at S-10. It further states, "It is strongly recommended that prospective investors in the Class A Certificates consider and evaluate publicly available financial and other information regarding the Underlying Issuer [Ambac]." *Id*. SFIS further attempts to limit liability, stating the Class A Certificates "do not represent an interest or obligation of the Depositor [SFIS], the Underlying Issuer [Ambac], the Trustee [U.S. Bank Trust National Association], the Underwriters [including Wachovia], or any affialiates of any thereof." *Id*. at S-21. Nonetheless, the STRATS Final Prospectus provides that, for tax purposes, "as a holder of a Class A Certificate, you will be treated as the owner of the pro rata share of the Underlying Securities [the DISCS]." *Id.* at S-28.

## LEGAL ARGUMENT

The Court has framed the unresolved issue in the motion to dismiss as:

> [W]hether Ambac falls within the group of non-issuers who can be held liable for non-disclosure or mis-disclosure relating to a particular security.

> Put otherwise, does the complaint (including the documents comprehended within it) contain sufficient allegations of fact to give rise to an inference that Ambac is not so remote from the issuance of the STRATS (wherever that line may be) as to fall within the group of non-remote persons/entities who, under *In re NYSE Specialists* and *Nortel*, can fairly be sued for securities fraud in connection with securities issued by someone else.

February 5, 2010 at 3. These inquiries are fact-based, proven primarily through the facts and theories addressed in this Court's recent opinion, as well as facts that will be unearthed during the discovery phase of this litigation. *See Beneficial Commercial Corporation v. Murray Glick Datsun, Inc.*, 601 F.Supp. 770, 775 (S.D.N.Y. 1985) (foreseeability is a question of fact); *Yates v. Dow Chemical Company*, 414 N.Y.S.2d 200, 203 (2d Dept. 1979) (holding, consistent with *MacPherson v. Buick Motor Co.,* 217 N.Y. 382 (1916), that "[a]n injured person can assert a claim for redress against [a remote seller] of an allegedly defective component part…Elimination of this possibility would require extensive discovery and there have been no discovery proceedings."); *Mull v. Colt Co.*, 31 F.R.D. 154, 168 (S.D.N.Y. 1962) ("There is no doubt that the range of reasonable apprehension is at times a question for the court, and at times, if varying inferences are possible, a question for the jury…. The question of foreseeability here should be left to the jury.").

Importantly, the sufficiency of plaintiffs' complaint with respect to such foreseeability/remoteness issues is analyzed in the context of a Rule 8(a) pleading standard. Plaintiffs' detailed 257 paragraph complaint, combined with the public documents incorporated therein by reference and properly before the Court on this motion, satisfies a notice pleading standard.

I.    **AMBAC'S    FRAUDULENT    DISCLOSURES    CAUSED    THE STRATS PURCHASERS' ENTIRE INJURY**

The allegations of the complaint demonstrate that there is a direct relationship between Ambac and the STRATS.  Unlike mutual funds or ETFs, the only security held by the STRATS Trust was the DISCS.  As a result, the value of the STRATS both rose and fell along with the value of the DISCS.  For this very reason, SFIS instructed investors to look to Ambac's disclosures in order to determine the value of the STRATS. The SEC even recognizes this direct relationship, similarly advising purchasers of derivative asset-backed securities to rely upon the disclosures of the underlying security when making their purchases.  Thus, the injury here is anything but remote – even in the absence of immediate privity, the scope of the injuries suffered by the STRATS purchasers are directly, and solely, related to Ambac's false and misleading disclosures; just like DISCS purchasers were injured as a result of Ambac's fraud, so too were STRATS purchasers.  However, the ultimate question before the Court centers on the relationship between Ambac and the actual sale of the STRATS to Plaintiffs in this case. There are two main issues that touch on this fact:  (1) whether it was foreseeable to Ambac that a derivative security would be created from the DISCS and sold on the open market; and (2) whether the overlapping relationship between the parties involved in the sale of the DISCS and the parties involved in the sale of the STRATS places Ambac on the "non-remote" side of the line.  The answer to both questions is a resounding "yes."

II.    **CREATION OF THE STRATS WAS FORESEEABLE TO AMBAC**

Ambac cannot reasonably claim that it had no knowledge that a derivative asset-backed security like STRATS would be created from its DISCS.  Equally transparent is

any claim that it was not foreseeable that STRATS purchasers would be directed to, and would reasonably rely on, Ambac's disclosures regarding its operations and finances.

Ambac has been in the finance business since 1971. As the finance industry evolved, and securities began to take different forms, Ambac took advantage of this change and adapted its business practices. Indeed, many investment banking firms became involved with derivative asset-backed securities in some way, including several of the Underwriters, as trusts such as the STRATS Trust became fairly common-place in the securities market in recent years. Indeed, Ambac was intimately involved with derivative asset-backed securities; it dealt with them on a regular basis, insuring more than $20 billion in derivative asset-backed securities in 2007, the year the DISCS were issued.

As set forth in the Complaint, Ambac's operations were focused on complex, asset-backed structured finance obligations such as RMBS and CDOs. Ambac repeatedly, publicly acknowledged that it investigated the underlying collateral before deciding whether to insure derivative asset-backed securities. Whether it followed its own underwriting procedures or not, Ambac touted these procedures, publicly representing what it believed to be proper due diligence when investing in derivative asset-backed securities. Thus, while Ambac disclaims liability here because it was not involved in the creation or sale of the STRATS, it routinely, publicly acknowledged that it has done exactly what the STRATS purchasers did here – looked to the underlying collateral to determine the value of a derivative asset-backed security when making an investment decision. Given this knowledge, and Ambac's desire to (1) pass off the risk of its own debt, as well as (2) repurchase its stock in accordance with its agreement with

Goldman Sachs, one could not only argue that creation of derivative securities such as the STRATS Trust was not only foreseeable to Ambac, but that it was intended.

Indeed, the DISCS (which were not traded on the open market) were marketed in such a way that derivative asset-backed securities could readily be created from them, and then sold on the open market so that the risk could be passed to the general public. Because the DISCS were not sold on any market, they were illiquid, therefore, the STRATS provided the liquidity necessary for the securities while allowing Ambac to remove itself from this sale – decreasing its debt-load without jeopardizing its coveted AAA rating. Further, Ambac knew that prohibitions on collateralizations are common in the finance industry. A sophisticated investor like Ambac, and the Underwriters here, knew how to structure the DISCS in such a way to benefit Ambac, and had Ambac not wanted the DISCS to be repackaged, it could easily have prohibited it by including such prohibition in the DISCS Indenture. To the contrary, the ability to repackage the DISCS into a liquid product made them more attractive to private investors, and Ambac knew that.

The court in *MacPherson* held that negligence can be attributed to a remote seller who had "knowledge that in the usual course of events the danger will be shared by others than the buyer" and that "[s]uch knowledge may often be inferred from the nature of the transaction." 217 N.Y. 382 at 389-90. Subsequent courts expanded upon this holding. *See, e.g., Fredericks v. American Export Lines, Inc.*, 227 F.2d 450, 453 (2d Cir. 1955) ("[M]any New York cases, decided after *MacPherson v. Buick*, have held that the negligent manufacturer of an article…when put to the use for which it was intended, may be liable, even though the negligence would have been without harmful effect had an

intervening purchaser diligently performed his duty to inspect….That the intervening purchaser will remain passive or otherwise fail to do what he ought to do to prevent the course of events, is a reasonably foreseeable consequence of the original wrongdoing."); *Smith v. Peerless Glass Co., Inc.*, 259 N.Y. 292, 294-96 (1932) (the maker of a bottle that was sold to another defendant who then filled it with soda water and put it on the market could be liable for negligence because "[t]he maker knew the purpose for which the bottle was to be used, knew that bottles sometimes exploded and may readily be presumed to have known that when used for its intended purpose this bottle would be subjected to contact with cold, and that it would, if striated, be apt to explode."); *Mull*, 31 F.R.D. at 167-68 ("The duty of care, without privity, has now become so well established that it would be sheer affectation to pile up citation of decisions upon it….Although *MacPherson* itself involved personal injury to a purchaser of an automobile the doctrine has been extended to encompass other users….the rule of *MacPherson* also extends to defendants who are not manufacturers.").

Further, "the concept of foreseeable risk is universally taken to mean the foreseeability of a general kind or type of risk, rather than the foreseeability of the precise chain of events leading to the particular injury in question." *Hall v. E.I. Du Pont De Nemours & Co., Inc*., 345 F.Supp. 353, 362 (E.D.N.Y. 1972) (manufacturer liable to remote purchaser even though privity was lacking); *see also Mull*, 31 F.R.D. at 168 ("Foreseeability remains the touchstone.  And it has long been accepted that foreseeability does not mean that the precise hazard, risk or chain of events must be anticipated.  Restatement, Torts § 435."). "[F]oreseeability is defined not simply by actual notice but by actual *or constructive* notice – by what the '[defendant] knew or had

reason to know….'"  *Sanchez v. State of New York*, 99 N.Y.2d 247, 255 (N.Y. Ct. App. 2002).

As best-stated in *MacPherson*, these cases "help to characterize the trend of judicial thought" with respect to liability for remote sellers; a trend of thought that is rooted in fact and focuses on policy and common sense rather than rigid adherence to the arcane rule that liability only lies with the direct seller; a rule that *MacPherson* originally belied.  *MacPherson*, 217 N.Y. at 387; *see also Clark v. Bendix Corporation*, 345 N.Y.S.2d 662, 663 (2d Dept. 1973) (holding that plaintiff can seek redress from a remote seller of a component part, stating, "the courts act in the finest common-law tradition when we adapt and alter decisional law to produce common-sense justice….To deny the injured plaintiff here the opportunity to proceed on a warranty theory against the manufacturer of the component party which may have directly caused the accident would produce an injustice.").  As this Court is aware, scholars have recognized that the time has come to hold sellers other than direct issuers liable for their fraudulent disclosures under Rule 10b-5, in accordance with *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89 (2d Cir. 2007) , and continuing the "trend of judicial thought" identified in *MacPherson* is imperative at this time, not just because of the current economic climate and collapse of the securities market due specifically to the conduct of companies such as Ambac, but because this case, on these facts, is the ideal situation to do so.

The creation of the STRATS Trust to hold Ambac DISCS, and STRATS purchasers' reliance on Ambac's disclosures when ascertaining the value of the STRATS, was foreseeable because it was a readily accepted practice in the finance industry, because SFIS insisted upon it in the STRATS Final Prospectus, because it was

encouraged by the SEC, and – in line with *MacPherson* and its progeny – because Ambac, an active participant in the finance industry, publicly acknowledged that it did the same thing in its regular course of business.

### III. THE RELATIONSHIP BETWEEN THE PARTIES INVOLVED IN CREATING BOTH THE DISCS AND THE STRATS MAKES AMBAC A NON-REMOTE SELLER

The relevant series of events applicable here are as follows:  (1) Wachovia purchased and underwrote and then sold $20 million of DISCS it bought directly from Ambac; (2) Wachovia then purchased $37 million DISCS "in the secondary market"; (3) Wachovia then sold the $37 million DISCS to its wholly owned subsidiary, SFIS; (4) SFIS then set up a trust for the sole purpose of holding only the DISCS, creating the STRATS security thereafter; then (5) Wachovia repurchased and underwrote half of the STRATS which were then sold on the open market.   Thus, while the Court inferred that Wachovia made the initial DISCS purchase from Ambac, and that a subsidiary of Wachovia made the second DISCS purchase on the secondary market, Wachovia's relationship to the DISCS is much closer than that because Wachovia itself made *both* purchases, and served as an underwriter for *both* the DISCS and the STRATS.

This series of events was just a form over substance series of transactions designed only to avoid repackaging the original $20 million DISCS Wachovia purchased from Ambac (which unequivocally would have satisfied the seller requirement of Rule 10b-5).  The three month separation between Wachovia's sale of the $20 million DISCS it bought from Ambac and Wachovia's repurchase of $37 million DISCS from the "secondary market" to create the STRATS, should not serve to eliminate securities fraud liability under the facts here and in the context of a motion to dismiss subject to a Rule 8(a) pleading standard.  At the time the DISCS were issued and sold though private

transactions, Ambac and the Underwriters intended derivative asset-backed securities such as STRATS to be created, and that the risk associated with the DISCS would be passed off to the general public while creating a public market (and therefore increased demand for the DISCS). DISCS were valuable to the Underwriters, including Wachovia, for this very reason, and Ambac was not blind to the fact that this repackaging was a common phenomenon. Wachovia, the creator of the STRATS, was the underwriter for both the DISCS and the STRATS; and had created STRATS on no less than 27 occasions prior to Ambac's issuance of the DISCS. On each occasion where a STRATS trust was created, Wachovia directed purchasers of STRATS to look to the underlying securities [in this case, DISCS] to interpret their value. Thus, Ambac's argument relies upon one simple fact to avoid liability here – instead of using the $20 million DISCS Wachovia initially purchased from it to create the STRATS, Wachovia re-purchased $37 million DISCS three months later (to fund the trust of its own subsidiary, created solely for the purpose of holding solely the DISCS).

At least one blog (quoting a Morgan Stanley analyst) has recognized that it was a virtual certainty that derivative securities, such as the STRATS would be created from the DISCS and that Ambac would benefit from this derivative market. Mish's Global Economic Trend Analysis: Stock Buybacks: A Good Thing Or a Slipped Discs? (October 30, 2007), available at http://globaleconomicanalysis.blogspot.com/2007/10/stock-buybacks-good-thing-or-slipped.html. As stated by the Morgan Stanley representative:

> Ambac Financial...has just issued $400 million worth of new debt in complex hybrid debt notes, so-called [DISCS]…Why issue 400mln worth of debt to buy 400mln worth of stock, when one can issue 800 mln worth of debt to buy back 800mln worth of stock? Another question for another

time would be: if the company generates so much extra cash flow to pay the very substantial costs of this transaction plus the very substantial interest on the debt, why not just buy the stock in the open market with its own cash?

Think about the complexity of the deal; think about the work that has been done by lawyers, underwriters, analysis, brokers, compliance people, technology professionals, etc. All of them need to be paid. Think about the very complex nature of this debt, which will be sitting in someone's books as an asset; ***think about all the even more complex derivatives that will be, without question, created based on this debt***.

Heck, we should all be grateful to ABK [Ambac]: This deal, as absurd as it is, has done its small part to maintain all this complexity for another 15 minutes.

*Id*. (emphasis added). Interestingly, the blog goes on to ask "[i]nquiring minds are wondering what the CEO and former CEO (current director) were doing with their own money after the buyback announcement." The answer – as recognized by the blog – they were selling a majority of their stock for enormous profits. *Id*. That the issuance of the DISCS benefitted both Ambac and its executives is virtually certain.

As this Court previously recognized, Plaintiffs here are "the precise class for the protection of which the 1934 Act was enacted…." *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 507 (3d Cir. 1988), *cert. den*., 490 U.S. 1114 (1989). Ambac's relationship to the STRATS is anything but remote, and Ambac indeed benefitted from marketing the DISCS in such a way that a derivative security could be created and sold on the open market, and the STRATS are, without a doubt, "a security to which the alleged misrepresentations relate." Plaintiffs could never recover anything from SFIS, the SPV that issues the securities, so limiting the right to sue for misrepresentations in connection with the purchase of a derivative asset-backed security to the shell corporation that is technically the "issuer" effectively means that the general public has no recourse, while

Ambac was able to (1) pass of the risk of its own debt to the general public; (2) while making enough money to re-purchase (and likely, as a result, inflate) its own stock – all the while insulating itself from its own fraud.  The primary purpose of the securities laws is to provide protection to investors, and they simply cannot support such a result.  *See, e.g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).

## CONCLUSION

For all the foregoing reasons and based on all prior pleadings and proceedings herein, Defendants' motion to dismiss should be denied in all respects.  Should the Court grant Defendants' motion, Plaintiffs respectfully request leave to amend.  Given the detailed factual nature of the foreseeability/remoteness issues, leave to amend should be granted to provide further detail of such relevant facts, which are only summarized herein due to page constraints.

Dated:  February 19, 2010

**GARDY & NOTIS, LLP**

By:___s/ Mark C. Gardy_____
     Mark C. Gardy
     James S. Notis
     Kelly A. Noto
     Kira German
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337

*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

      Notice of this filing will be sent to all counsel of record by operation of the

Court's electronic filing system as follows:

        Peter C. Hein
        (pchein@wlrk.com)
        Warren R. Stern
        (wrstern@wlrk.com)
        Joshua A. Naftalis
        (janaftalis@wlrk.com)
        C. Lee Wilson
        (clwilson@wlrk.com)
        **WACHTELL, LIPTON, ROSEN & KATZ**

        *Counsel for Defendants*


                        s/Kelly A. Noto
                        Kelly A. Noto
                        **GARDY & NOTIS, LLP**
                        560 Sylvan Avenue
                        Englewood Cliffs, New Jersey 07632
                        Tel: 201-567-7377
                        Fax: 201-567-7337